**ILGWU NATIONAL RETIREMENT FUND, Sol C. Chaikin and Joseph Moore, Plaintiffs-Appellants,**

v.

**LEVY BROS. FROCKS, INC., Defendant-Appellee.**

**No. 769, Docket 87–7870.**

United States Court of Appeals, Second Circuit.

Argued Feb. 22, 1988.

Decided May 17, 1988.

Marc E. Richards, New York City (Myerson & Kuhn, Richard Levy, Jr., Sara Chenetz; Booth, Marcus & Pierce, New York City, of counsel), for plaintiffs-appellants.

David B. Bernfeld, New York City (Hoffinger Friedland Dobrish Bernfeld & Hasen, Mark W. Geisler, of counsel), for defendant-appellee.

James J. Armbruster, Washington, D.C. (Pension Ben. Guar. Corp., Gary M. Ford, Gen. Counsel, Carol Connor Flowe, Deputy Gen. Counsel, Jeanne K. Beck, of counsel), as amicus curiae for Pension Ben. Guar. Corp.

Before FEINBERG, Chief Judge, PRATT, Circuit Judge and McLAUGHLIN, District Judge.[*]

FEINBERG, Chief Judge:

ILGWU National Retirement Fund (the "Fund") and two of its trustees appeal from a judgment of the United States District Court for the Southern District of New York, Bernard Newman, senior judge of the United States Court of International Trade, sitting as a district court judge by designation, dismissing, after a bench trial, the Fund's complaint against Levy Bros. Frocks, Inc., a New York corporation now dissolved (the "Corporation"). Appellants seek to recover from the Corporation "withdrawal liability" in the sum of $277,881, plus interest, liquidated damages, costs and attorneys' fees, allegedly due the Fund pursuant to the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001, et seq., as amended by the Multiemployer Pension Plan Amendments Act of 1980, 29 U.S.C. § 1381, et seq. (collectively, "MPPAA"). The Fund is an employee pension benefit plan and a multiemployer plan within the meaning of 29 U.S.C. §§ 1002(2) and (37).

This case presents the question of whether under MPPAA the Corporation must arbitrate its defense to withdrawal liability that it was not bound on and after the effective date of MPPAA by a contract to contribute to the Fund, in order to preserve that defense for ultimate judicial review. For the reasons given below, we conclude that MPPAA does require the Corporation to raise such a defense in arbitration. We therefore reverse the judgment of the district court and remand the case for further proceedings.

I.   Statutory Framework

Before turning to the facts, it is useful to summarize the statutory framework governing this case. MPPAA was enacted by Congress in September 1980 for "[t]he primary purpose of ... protect[ing] retirees and workers who are participants in [multiemployer] plans against the loss of their pensions." H.R.Rep. No. 96–869, Part I, 96th Cong., 2d Sess. 51 (1980) ("House Report"), reprinted in 1980 U.S. Code Cong. & Ad. News 2918, 2919. In particular, Congress was concerned that as of 1980:

(1) the magnitude of the risk and the potential exposure of the [multiemployer plan] system are intolerably high; and (2) existing law and particularly the plan termination insurance provisions are inadequate to assure financially sound multiemployer plans, may accelerate declines and further weaken and hasten the termination of financially weak plans.... [T]here are serious defects in current law which undermine the benefit security of multiemployer plan participants.

Id. at 57, 1980 U.S. Code Cong. & Ad. News at 2925. Thus, in *T.I.M.E.-DC, Inc. v. Management-Labor Welfare & Pension Funds*, 756 F.2d 939, 943 (2d Cir.1985), we pointed out that "[t]he policy of the MPPAA ... was to protect the interests of participants and beneficiaries in financially distressed multiemployer plans and to encourage the growth and maintenance of multiemployer plans." See also *Textile Workers Pension Fund v. Standard Dye & Finishing Co., Inc.*, 725 F.2d 843, 847–49 (2d Cir.) (discussing history of MPPAA), cert. denied, 467 U.S. 1259, 104 S.Ct. 3554, 82 L.Ed.2d 856 (1984).

* Honorable Joseph M. McLaughlin, United States District Judge for the Eastern District of New York, sitting by designation.

Under MPPAA an employer who withdraws from a multiemployer plan, with certain exceptions, is assessed "withdrawal liability," that is, the employer is required to continue funding its proportionate share of the plan's unfunded vested benefits. 29 U.S.C. §§ 1381, 1391. The purpose of withdrawal liability "is to relieve the funding burden on remaining employers and to eliminate the incentive to pull out of a plan which would result if liability were imposed only on a mass withdrawal by all employers." House Report at 67, 1980 U.S. Code Cong. & Ad. News at 2935. A complete withdrawal from a plan occurs when an employer (1) permanently ceases to have an obligation to contribute to a plan arising (a) under one or more collective bargaining or related agreements or (b) as a result of a duty under applicable labor-management relations law; or (2) permanently ceases all covered operations under a plan, 29 U.S.C. §§ 1383, 1392. Withdrawal liability may also be imposed for partial withdrawals. 29 U.S.C. §§ 1381, 1385. The methods for computing withdrawal liability are set forth in 29 U.S.C. § 1391, and certain limitations on liability are set forth in 29 U.S.C. § 1405.

When an employer withdraws from a multiemployer plan, the plan sponsor, that is, the entity maintaining the plan, must determine the amount of the employer's withdrawal liability, notify the employer of the amount and make a demand for payment. 29 U.S.C. § 1382. Notice and other procedural provisions governing the collection of withdrawal liability are set forth in 29 U.S.C. § 1399, which provides, among other things, that: (1) the plan sponsor shall notify an employer of the amount of its withdrawal liability and the schedule for liability payments "[a]s soon as practicable after an employer's complete or partial withdrawal," 29 U.S.C. § 1399(b)(1); (2) no later than 90 days after the employer receives notice of the liability assessment, the employer may ask the plan sponsor to review the liability determination, identify any inaccuracy in the determination, or furnish additional relevant information, 29 U.S.C. § 1399(b)(2)(A); (3) after a "reasonable review of any matter raised" by the employer, the plan sponsor shall notify the employer of the plan sponsor's decision, the basis for it and any change in the employer's liability, 29 U.S.C. § 1399(b)(2)(B); (4) notwithstanding any requests for review or appeal of the determination, however, withdrawal liability is payable in accordance with the schedule set forth by the plan sponsor beginning no later than 60 days after the date of demand, 29 U.S.C. § 1399(c)(2); and (5) in the event of a default—defined as, among other things, the failure to make any payment when due that is not cured within 60 days after the employer receives written notification from the plan sponsor of such failure—the plan sponsor may require immediate payment of the outstanding amount of an employer's unpaid withdrawal liability, plus accrued interest, 29 U.S.C. § 1399(c)(5).

Disputes over withdrawal liability determinations are to be resolved by arbitration, as provided in 29 U.S.C. § 1401(a)(1):

Any dispute between an employer and the plan sponsor of a multiemployer plan concerning a determination made under sections 1381 through 1399 of this title shall be resolved through arbitration. Either party may initiate the arbitration proceeding within a 60–day period after the earlier of—

(A) the date of notification to the employer under section 1399(b)(2)(B) of this title, or

(B) 120 days after the date of the employer's request under section 1399(b)(2)(A) of this title.

The parties may jointly initiate arbitration within the 180–day period after the date of the plan sponsor's demand under section 1399(b)(1) of this title.

The arbitrator's award is subject to review by the courts, 29 U.S.C. § 1401(b)(2), although the arbitrator's findings of fact are presumed correct unless rebutted by a clear preponderance of the evidence, 29 U.S.C. § 1401(c). When no arbitration proceeding is initiated, the plan sponsor may bring an action in state or federal court to collect the amounts due and owing. 29 U.S.C. § 1401(b)(1). Moreover, during the pendency of any arbitration proceedings,

payments must still be made in accordance with the sponsor's determination, with any subsequent adjustments to occur after the arbitrator's final decision. 29 U.S.C. § 1401(d). However, the Pension Benefit Guaranty Corporation (the "PBGC"), a corporation established under 29 U.S.C. § 1302 to administer and enforce the provisions of ERISA relevant here, and amicus on this appeal, has softened the impact of this "pay-first-question-later system" through regulations which provide that the plan sponsor cannot consider the employer to be in default and accelerate its demand for payment until the 61st day after the review and arbitration process is complete. *T.I.M.E.–DC*, 756 F.2d at 947; 29 C.F.R. § 2644.2(c).

## II. Background

With this framework in mind, we turn to the background of this case. Prior to 1967, three brothers, Louis, Albert and Hyman Levy, operated a small business that manufactured women's clothing as a partnership under the name "Levy Bros. Frocks" (the "Partnership"). In 1962, the Partnership became a member of the Cotton Apparel & Robe Producers Association of United States, Inc. (the "Association"), a trade association of apparel manufacturers that conducts multiemployer collective bargaining on behalf of its employer members. During the period relevant to this case, the Association negotiated, signed and administered a continuous series of collective bargaining agreements with the International Ladies' Garment Workers' Union (the "ILGWU"). After negotiation of each successive agreement, the Association forwarded copies of the agreement to its members and requested that they execute Certificates of Authorization and Assumption (the "Authorizations") authorizing the Association to enter into the agreement on the member's behalf. Appellee does not dispute that the Partnership executed Authorizations for the consecutive three-year collective bargaining agreements between the Association and the ILGWU commencing 1961, 1964, and 1967, or that the Partnership fully complied with the agreements, including the provisions governing contributions to the Fund.

In 1967, the three Levy brothers incorporated their business and became the Corporation's sole shareholders. In most respects the operation of the business continued as before. However, while the Corporation continued to pay dues to the Association until the Corporation ceased doing business in 1982, it consistently refused to execute the Authorizations that were sent to it by the Association with respect to the collective bargaining agreements negotiated between 1970 and 1982. Apparently, the Association and the ILGWU were aware of the Corporation's refusal to sign the Authorizations. Nonetheless, the Corporation continued to have various dealings with the ILGWU.

The Corporation continued to observe most of the provisions of the collective bargaining agreements that were in effect between 1970 and 1982. Most significantly, it paid its factory workers the union scale or better and made contributions for fringe benefits to the ILGWU in the precise sums required by the collective bargaining agreements, amounting at times to slightly over 20 percent of the Corporation's payroll. The Corporation permitted the ILGWU to conduct audits of its books and records and paid deficiencies billed by the union. Payments for fringe benefits were made in a lump sum amount, payable to the ILGWU's "Health & Welfare Fund," which the union allocated among various benefit funds for the Corporation's employees. The Corporation contends that such contributions were intended as a "convenient way to pay vacation, health and welfare benefits," and that it was not aware that the ILGWU was also paying some of the money into a retirement fund, namely, the Fund, for the benefit of the Corporation's workers. The Corporation also argues that it clearly asserted that it was a non-union shop and refused to comply with other key provisions of the collective bargaining agreements.

In 1982, the Corporation ceased all business operations and notified the Association to that effect. The Corporation was

liquidated the following year and approximately $200,000 was distributed among the three Levy brothers.

In June 1983, just over a year after the Corporation went out of business, the Fund sent a letter to Louis Levy, the Corporation's former president, claiming that the Corporation owed the Fund withdrawal liability in the amount of $277,703, subject to actuarial adjustments, based upon the Corporation's withdrawal from the Fund. The letter indicated that this amount had been arrived at pursuant to 29 U.S.C. § 1391(b), based upon the amounts that the Corporation had been obligated to contribute to the Fund between 1975 and 1981. The letter stated that payments were due on a quarterly basis over a 10½ year period. It explained that the Corporation had the right within 90 days to ask the Fund to review its liability determination, but that any dispute arising out of the Fund's determination must be resolved through arbitration. It further stated that the Corporation could intiate arbitration within a 60–day period after the earlier of (a) the date of the Fund's notice of findings and determination after any review or (b) 120 days after the Corporation's request for a review of the Fund's liability determination.

In September 1983, after the Corporation failed to make its first scheduled quarterly payment, the Fund sent another letter to Louis Levy warning that unless the Corporation made all past due and current payments within 60 days, the Fund, as permitted by 29 U.S.C. § 1399(c)(5), would commence proceedings to collect the full outstanding amount of withdrawal liability immediately. An attorney for the Corporation then contacted the Fund claiming that the Corporation had no withdrawal liability, but also seeking review of the Fund's calculations. The Corporation sought clarification of its potential liability under 29 U.S.C. § 1405, pursuant to which a corporation's withdrawal liability may be limited to 30 percent of its net liquidation value. However, the Corporation, at that time, refused to provide the Fund with its income tax returns, which the Fund had requested to establish the Corporation's net liquidation value.

In January 1984, the Fund notified Louis Levy that it had completed its actuarial review and that the amount of withdrawal liability due was $277,881. The Corporation did not seek arbitration of the claimed withdrawal liability. In May 1984, the Fund commenced this action claiming that the Corporation was in default pursuant to 29 U.S.C. § 1399(c)(5) and seeking immediate payment of the $277,881 withdrawal liability, plus interest, liquidated damages, costs and attorneys' fees.

In its answer, the Corporation asserted that at no time after January 1, 1979 was it a party to the Fund's multiemployer plan or otherwise obligated to contribute to the Fund and thus it was not obligated under MPPAA to pay withdrawal liability. The Corporation also raised a variety of other defenses, challenging, among other things, the Fund's compliance with the notice and information requirements of MPPAA, the Fund's calculation of its withdrawal liability and the constitutionality of imposing withdrawal liability against it. The Corporation also claimed that it had relied on representations by the Fund that an employer who ceased operations would have no withdrawal liability provided it did not thereafter continue or resume such operations without an obligation to contribute to the Fund or sell all or a portion of its business to a competing non-contributing employer. The Corporation asserted counterclaims for attorneys' fees and costs, other legal and equitable relief based upon appellants' alleged breach of their fiduciary duties and any damages resulting from the Fund's misrepresentations to the Corporation that an employer who ceased operations, without more, would not be liable for withdrawal liability.

In response, appellants argued that the Corporation was barred as a matter of law from raising any claims concerning the Fund's calculation of withdrawal liability due to its failure to initiate arbitration pursuant to 29 U.S.C. § 1401. Appellants raised this argument in the district court in connection with their motion for a protective order against the Corporation's discovery requests, which the district court

denied, and again in their pre-trial and post-trial briefs, although they did not move for summary judgment. Appellants also disputed the Corporation's claim that it was not obligated to contribute to the Fund under a collective bargaining or related agreement at any time after January 1, 1979, and disputed other claims raised by the Corporation.

In September 1987, after a three-day bench trial, the district judge entered judgment dismissing the complaint and counterclaims. The judge concluded that: (1) the Corporation was not required to arbitrate the issue of whether it had an obligation to contribute to the Fund under any collective bargaining agreement; and (2) the Corporation was not bound by any collective bargaining agreement, or any related agreement pursuant to 29 U.S.C. § 1392(a), to contribute to the Fund during the relevant period of 1979–1982, and thus had no withdrawal liability. The judge also concluded, as an apparent alternative holding, that the Fund had not sent the initial notice of withdrawal liability to the Corporation "[a]s soon as practicable," as required by 29 U.S.C. § 1399(b), indicating that appellants' action was therefore barred for failure to satisfy a condition precedent to suit and citing *Debreceni v. George Lamoureux & Co.*, 629 F.Supp. 598, 601 (D.Mass.1986). The court dismissed the Corporation's counterclaims for attorney's fees and damages as meritless. This appeal followed.

### III. Discussion

The key issue on appeal is whether the Corporation is precluded from challenging the Fund's determination of withdrawal liability because the Corporation did not seek to arbitrate that question. The district court held that the Corporation had not been under an obligation to arbitrate its withdrawal liability. Appellants argue that this was error. The Corporation, however, claims that since it never agreed to a collective bargaining agreement or related agreement during the relevant time period, it was never subject to MPPAA and therefore was not obligated to submit to arbitration. The Corporation relies upon *Refined Sugars, Inc. v. Local 807 Labor-Management Pension Fund*, 580 F.Supp. 1457, 1462 (S.D.N.Y.1984) (Refined Sugars I), for the proposition that a party cannot be compelled to arbitrate a dispute over withdrawal liability if it is not subject to MPPAA.

In *Refined Sugars I*, a corporation against whom a fund had asserted a claim of withdrawal liability brought an action for declaratory and injunctive relief, claiming that since it was not an "employer" as defined by MPPAA it had no withdrawal liability. The corporation apparently commenced the action before the period for arbitration had expired and, in response to the fund's demand for payment, made payments for the amount allegedly due into an escrow account. The court addressed two separate arguments raised by the plaintiff: (1) that the question of who is an "employer" within the meaning of section 1401 is not arbitrable; and (2) that even if the question is arbitrable, "exhaustion" of the arbitration remedy was not required in that case. The court concluded that the definition of an employer under 29 U.S.C. § 1002(5)—which provides that an employer is "any person acting directly as an employer, or indirectly in the interest of an employer, in relation to an employee benefit plan; and includes a group or association of employers acting for an employer in such capacity"—was "so conclusory as to necessarily require statutory interpretation," *id.* at 1461, and therefore exhaustion of the arbitration remedy was not required. The court also indicated that the question was not arbitrable, stating that the case was analogous to an action in which it is alleged that there is a contractual duty to arbitrate. The court reasoned that just as a party in the latter instance "cannot be compelled to arbitrate if an arbitration clause does not bind it at all," the plaintiff could not be compelled to arbitrate its dispute concerning withdrawal liability under MPPAA if it was not subject to MPPAA. *Id.* at 1462, citing *John Wiley & Sons, Inc. v. Livingston*, 376 U.S. 543, 547, 84 S.Ct. 909, 913, 11 L.Ed.2d 898 (1964).

The question presented in the Refined Sugars litigation was whether a sugar refiner that had employed an independent

trucking company to operate its fleet of trucks was an "employer" with respect to the employees of the trucking company. *Refined Sugars, Inc. v. Local 807 Labor–Management Pension Fund*, 632 F.Supp. 630, 631 (S.D.N.Y.1986) (Refined Sugars II). In *Refined Sugars II*, the court concluded that the refiner was not an "employer" within the meaning of MPPAA since (1) the refiner was not the "direct employer" of the covered employees, see 29 U.S.C. § 1002(5); and (2) the refiner and the trucking company were not under common control within the meaning of 29 U.S.C. § 1301(b)(1). *Id.* at 632. Here, the question is quite different; there is no dispute that the Corporation was the direct employer of the employees on whose behalf the Fund seeks to collect withdrawal liability. Instead, the dispute is over whether the Corporation had an "obligation to contribute" to the Fund within the meaning of 29 U.S.C. § 1392.

■ We disagree with the reasoning in *Refined Sugars I* that the duty to arbitrate under MPPAA is directly analogous to a contractual duty to arbitrate. The Corporation's duty to arbitrate its dispute with the Fund arises under MPPAA and is based upon Congress' express desire to have disputes concerning withdrawal liability resolved through arbitration. This obligation is not dependent upon the Corporation's intention to submit to arbitration, but rather is imposed on the Corporation under MPPAA. As the Ninth Circuit recently observed:

> the duty to arbitrate [arises] not from an agreement of the parties, but from the statute. The matters to be resolved by arbitration are not to be determined by the parties' intention, but by the intention of Congress.... [T]he statute states unambiguously that *"[a]ny* dispute between an employer and the plan sponsor ... concerning a determination made under sections 1381 through 1399 ... shall be resolved through arbitration,"* and Congress clearly intended exactly what those words import.

*Teamsters Pension Trust Fund v. Allyn Transportation Co.*, 832 F.2d 502, 505–06 (9th Cir.1987) (citations omitted) (emphasis in original).

■ The fact that the Corporation's duty to arbitrate, if it exists, is statutory in origin rather than consensual still begs the question of whether the statute applies in this instance. We believe it does. The relevant provision is 29 U.S.C. § 1401, quoted above, which requires arbitration of "[a]ny dispute between an employer" and a fund "concerning a determination made under sections 1381 through 1399." The dispute here over withdrawal liability is such a dispute. The Corporation spent much effort arguing in the district court and here that it was not bound by a collective bargaining agreement or related agreement during the relevant time period to contribute to the Fund. But, the question of whether the Corporation is an "employer" within the meaning of 29 U.S.C. § 1401, and thus bound to arbitrate its dispute with the Fund, does not in our view turn only on whether the Corporation was obligated to contribute to the Fund under a collective bargaining or related agreement during the relevant time period. Section 1002(5) provides that an "employer" is "any person acting directly as an employer ... in relation to an employee benefit plan...." For the purposes of section 1401 we interpret the phrase "in relation to an employee benefit plan" broadly. See *IUE AFL–CIO Pension Fund v. Barker & Williamson, Inc.*, 788 F.2d 118, 127 (3d Cir.1986) ("because ERISA (and the MPPAA) are remedial statutes, they should be liberally construed in favor of protecting the participants in employee benefits plans."). The Corporation does not dispute that its former employees were covered by the Fund and various other employee benefit plans and that its predecessor in interest, the Partnership, was obligated to contribute to the Fund. Moreover, as discussed above, the Corporation had various dealings with the ILGWU with respect to fringe benefit payments for its employees, and can thus be said to have acted "in relation to an employee benefit plan."

It is not as though the Corporation can justifiably claim that it is a complete stranger to the Fund, with the claim

against it coming out of the blue from an entity it never heard of or dealt with. Many of the Corporation's former employees now receive benefits from the Fund. The Corporation's principals, when operating as a partnership, made payments to the Fund for years and, even after the change in the form of doing business from a partnership to a corporation, these benefit payments continued until operations ceased. We need not decide at what point an employer's connection with a fund would be so attenuated as to support a defense that it was not an "employer" within the meaning of § 1401 and thus not obligated to submit to arbitration.

Several circuit courts agree that an employer can be subject to the arbitration provisions of MPPAA, even if arguably it was not obligated to contribute to a multiemployer plan during the relevant period for determining withdrawal liability. See, e.g., *Allyn Transportation Co.*, 832 F.2d at 505–06 (dispute over whether an employer withdrew prior to the effective date of MPPAA must be arbitrated); *I.A.M. National Pension Fund v. Clinton Engines Corp.*, 825 F.2d 415, 421–22 (D.C.Cir.1987) (same); *Warner–Lambert Co. v. United Retail and Wholesale Employee's Teamster Local No. 115 Pension Plan*, 791 F.2d 283, 287–88 (3d Cir.1986) (same). Cf. *Flying Tiger Line v. Teamsters Pension Trust Fund*, 830 F.2d 1241, 1250–51 (3d Cir.1987).

▪ The Corporation argues that, at a minimum, it had raised various questions of statutory construction that were appropriate for the district court to consider as a matter of discretion. We agree that the arbitration provisions of MPPAA do not constitute an absolute bar to federal jurisdiction, but instead constitute an exhaustion of administrative remedies requirement. *T.I.M.E.-DC*, 756 F.2d at 945. But while the failure to arbitrate first does not always prevent a party from seeking declaratory and/or injunctive relief against the imposition of withdrawal liability, the instances in which such relief is appropriate are likely to be rare. See *Clinton Engines Corp.*, 825 F.2d at 417–18 (such

cases are the narrow exception to the general rule of "arbitrate first"). "Congress clearly designed MPPAA so that the court will be the final forum for dispute resolution, and MPPAA's purposes would be undermined by the expense and delay that would be involved if litigation occurred prior to the Act's dispute resolution procedures." *Flying Tiger Line*, 830 F.2d at 1248–49.

In *T.I.M.E.-DC*, we held that exhaustion of the arbitration remedy was not required in an action for declaratory and injunctive relief involving the interaction of 29 U.S.C. § 1415 (governing transfers of assets to a new plan pursuant to a change in bargaining representation) with the withdrawal liability provisions. We concluded that the policies of the exhaustion doctrine—namely, "the application of the administrative body's superior expertise, promotion of judicial economy, and deference to the statutory scheme Congress created," 756 F.2d at 945—were not implicated in that case since (1) no questions of fact or issues of contract interpretation were raised; (2) the parties would probably seek judicial review of the arbitration decision; and (3) the statutory provision involved, section 1415, was "outside the scope of those issues that Congress directed to the arbitrator," *id.* Here, issues of fact—such as, what contract obligations did the Corporation agree to and how did the Corporation conduct its affairs with respect to the union and the Fund—and issues of contract interpretation pervade the Corporation's argument. Moreover, the issues of statutory interpretation raised by the Corporation largely involve interpretations under sections 1381 through 1399, interpretations which we believe Congress envisioned would be made by the arbitrator in the first instance. See *Flying Tiger Line*, 830 F.2d at 1253–55; *Clinton Engines Corp.*, 825 F.2d at 422 ("an exception for cases raising questions of statutory interpretation would 'drastically diminish the prime role Congress so plainly assigned to arbitration in the MPPAA dispute resolution scheme' ").

▪ Furthermore, if the Corporation's time for initiating arbitration proceedings

has expired, as it apparently has, the propriety of waiving the exhaustion requirement would be all the more questionable. Congress intended that disputes over withdrawal liability would be resolved quickly, and established a procedural bar for employers who fail to arbitrate disputes over withdrawal liability in a timely manner. See 29 U.S.C. § 1401(b)(1). If a party wishes to seek judicial resolution of its dispute without first submitting to arbitration it should seek declaratory and/or injunctive relief against the imposition of withdrawal liability before the time period to initiate arbitration expires. Cf. *Clinton Engines Corp.*, 825 F.2d at 427–28; *Barker & Williamson*, 788 F.2d at 129. The failure to seek such relief on a timely basis may, in some instances, lead to a harsh result, but the harshness of the default is largely "a self-inflicted wound." 788 F.2d at 129.

The Corporation argues that the time to initiate arbitration has not yet expired since the Fund never responded to the Corporation's request for a review of the withdrawal liability determination. It has also alleged that the Fund failed in other respects to comply with the procedural requirements of MPPAA. With the exception of the Corporation's challenge to the timeliness of the initial notice of withdrawal liability, these arguments were not addressed by the district court and have not been fully briefed on appeal.

We therefore remand to the district court for a determination of whether the conditions precedent to a suit for collection of withdrawal liability have been met. We disagree, however, with the district court's apparent conclusion that the mere failure of the Fund to send the initial notice of withdrawal liability until a year after the Corporation ceased doing business acts as a time bar to collection of withdrawal liability. We do not read the notice requirement of 29 U.S.C. § 1399(b)(1), which provides that notice must be sent to employers "[a]s soon as practicable" after withdrawal, to impose "a strict deadline for notifying employers of their withdrawal liability." *I.A. M. National Pension Fund v. Cullman Industries, Inc.*, 640 F.Supp. 1284, 1288

(D.D.C.1986). *Debreceni v. George Lamoureux & Co.*, 629 F.Supp. 598 (D.Mass. 1986), the case relied on by the district court, does not suggest otherwise. It merely holds that under section 1399(b)(1) the plan sponsor must notify the employer of the "amount of liability" and the "schedule for liability payments" and "demand payment in accordance with the schedule," as a precondition to a suit for collection of withdrawal liability. *Id.* at 601.

The PBGC argues that the procedures for identifying withdrawals and calculating and collecting withdrawal liability are detailed and demanding and therefore it is unreasonable to assume that a plan will be able to notify an employer of its withdrawal liability immediately upon the cessation of operations. We agree. We do not believe that Congress intended to impose such a burden upon the plan sponsor, but merely intended that demand for withdrawal liability should be made "as soon as practicable" as part of the overall scheme to provide for prompt payment of withdrawal liability. This action was commenced well within the six-year statutue of limitations under 29 U.S.C. § 1451(f), and in light of the complexity of the tasks imposed on the Fund under the statute and Congress' clear intent to *help* plans collect withdrawal liability, we cannot say that appellants' delay was so unreasonable as to support a defense of laches.

## IV.  Conclusion

The judgment of the district court is reversed and the case is remanded for a determination of whether the statutory conditions precedent for a suit for collection of withdrawal liability have been met. If those conditions have been met, then the court should enter judgment in favor of appellants for the relief sought in their complaint. If, however, the conditions have not been met, then the court should dismiss the suit and direct the parties to pursue their administrative remedies.