125 F.3d 526
 21 Employee Benefits Cas. 1799,
Pens. Plan Guide (CCH) P 23937B
CHICAGO TRUCK DRIVERS, HELPERS AND WAREHOUSE UNION
(INDEPENDENT) PENSION FUND, a pension trust, and
George Ossey, Jack Stewart, et al.,
Plaintiffs-Appellees,
v.
CENTURY MOTOR FREIGHT, INC., Defendant-Appellant.
 No. 96-3663.
 United States Court of Appeals,
Seventh Circuit.
 Argued April 18, 1997.
Decided Sept. 9, 1997.
 
 David S. Allen, Thomas J. Angell (argued), Jacobs, Burns, Sugarman, Orlove & Stanton, Chicago, IL, for Plaintiffs-Appellees.
 John R. Doyle, Cathy H. McNeil, McDermott, Will & Emery, Chicago, IL, Peter M. Lancaster (argued), Timothy Branson, Dorsey & Whitney, Minneapolis, MN, for Defendant-Appellant.
 Before CUMMINGS, MANION, and DIANE P. WOOD, Circuit Judges.
 MANION, Circuit Judge.
 
 
 1
 Century Motor Freight sold all of its assets to Wintz Parcel Drivers in February 1992. The sale meant that Century would no longer be making pension contributions on behalf of its former employees to the Chicago Truck Drivers Union Pension Fund, a multiemployer fund. The responsibility to make payments became Wintz's, but Century was by no means off the hook. Multiemployer pension plans are a popular way for employers to pool their risk and resources, and under ERISA[1] an employer withdrawing from the plan pays a penalty. That penalty is called "withdrawal liability," and it means the employer is liable to the plan for unfunded, vested pension benefits as determined by the fund's trustee. See 29 U.S.C. §§ 1381-83. The employer may contest the amount demanded by the trustee, but only through mandatory arbitration procedures. 29 U.S.C. § 1401.
 
 
 2
 Such was the fate of Century. When it sold to Wintz, it thought it had come to an agreement with the fund relieving it of withdrawal liability, which of course the fund was entitled to do. Under Century's agreement with the fund, Wintz had to enter into a collective bargaining agreement with the union, as well as post a $50,000 bond in favor of the fund, and Century had to pay everything it owed the fund. Century claims all those conditions were satisfied, which is why it says it was surprised when three years later (in 1995) the fund wrote Century reasserting the company's withdrawal liability. The record is unclear as to what prompted the reassessment, though Century suggested in the district court that it was prompted by Wintz's decision to shut down some of the acquired operations in 1995. Undoubtedly, the reason for the reassessment and its appropriateness will be fleshed out in arbitration, which the parties tell us is pending. For now the important point is that the fund instructed Century that it had to discharge its liability in a lump sum payment of $438,624 or by a payment schedule. When Century did not pay on an installment basis, the fund accelerated the balance owed.
 
 
 3
 Still Century paid nothing, prompting the fund to file suit in federal court to recover the principal sum of $438,624 plus interest, liquidated damages, court costs and reasonable attorneys' fees pursuant to 29 U.S.C. § 1132(g)(2). The fund successfully moved for summary judgment on its complaint. Century had argued that it was not legally required to pay an accelerated amount under 29 C.F.R. § 4219.31(c)(1),[2] a regulation issued by the Pension Benefit Guaranty Corporation (PBGC) delaying acceleration of a fund's withdrawal liability assessment where the employer has timely filed for arbitration over the matter (as Century did here). The district court determined that Century had made the same argument in a previous litigation involving the same issue (though sued by a different plaintiff), and that the court in that case had invalidated § 4219.31(c)(1) because it found it conflicted with ERISA. See Central States, Southeast & Southwest Area Pension Fund v. Century Motor Freight, Inc., No. 94 C 6615, 1995 WL 699655 (N.D.Ill. Nov.22, 1995) ("Century I"). The district court held that collateral estoppel precluded Century from invoking § 4219.31(c)(1) in this case.
 
 
 4
 The fund also asked the district court to award liquidated damages and interest on the accelerated amounts, plus costs and fees. The court agreed and awarded the fund $335,560.18. That sum represented the outstanding principal owed the fund, interest, $87,724.80 in liquidated damages, costs and fees.
 
 
 5
 We reverse the district court's determination that collateral estoppel precluded Century from litigating the validity of § 4219.31(c)(1), and further hold that this regulation prevents acceleration of a fund's withdrawal liability assessment where the employer has timely filed for arbitration.
 
 I.
 
 6
 An employer withdrawing from an ERISA plan typically has to pay withdrawal liability to the fund (in this case, a multiemployer pension fund). The fund sends a notice to the employer and a demand for the amount of liability. The employer may ask the plan sponsor to review the assessment of withdrawal liability, and if still dissatisfied, the employer may initiate arbitration under 29 U.S.C. § 1401(a). If the employer does not timely initiate the arbitration process to resolve a dispute over a plan's determination of withdrawal liability, the employer waives the right to contest the assessment and the amounts demanded by the plan become "due and owing" and the plan can sue to collect it.
 
 
 7
 The issue in this case is not whether the arbitration process was initiated, but instead whether the entire withdrawal liability is due before the arbitration process is complete. On the one hand ERISA seems to say that it is. Section 1399(c)(5) states that "[i]n the event of a default, a plan sponsor may require immediate payment of the outstanding amount of an employer's withdrawal liability, plus accrued interest on the total outstanding liability ..." (emphasis added). 29 U.S.C. § 1399(c)(5). But another section of ERISA, 29 U.S.C. § 1401(b)(1), appears to suggest that the employer may stay any obligation to pay the principal owed to the fund by timely seeking arbitration: "If no arbitration proceeding has been initiated ... the amounts demanded by the plan sponsor under section 1399(b)(1) of this title shall be due and owing on the schedule set forth by the plan sponsor." (Emphasis added.) Add to this mix a federal regulation, 29 C.F.R. § 4219.31(c)(1), issued by the PBGC. That regulation plainly states that a "default as a result of failure to make any payments shall not occur until the 61st day after the last of--... (iii) If arbitration is timely initiated ..., issuance of the arbitrator's decision." So on the one hand § 1399(c)(5) suggests that the fund may require "immediate payment" of a balance if an employer is in default, but on the other hand § 1401(b)(1) and C.F.R. § 4219.31(c)(1) appear to delay such a default and acceleration if the employer arbitrates.
 
 
 8
 Century's argument here is the same as it was in the district court--that the sections are not inconsistent at all. Rather, Century argues, the rule that emerges from ERISA and the PBGC's regulation is that a fund may accelerate, but not before the arbitrator makes his decision. In other words, the regulation would be inconsistent with the statute if it denied the right to accelerate in any circumstance, but it merely delays it, and this delay is entirely consistent with 29 U.S.C. § 1401(b)(1).
 
 
 9
 The district court did not determine whether the regulation conflicted with ERISA; rather, it found Century estopped to make their argument in the first place. In Century I, a different district court judge in the Northern District of Illinois rejected Century's argument, instead determining the regulation to be in direct conflict with ERISA and therefore finding it invalid. That decision was not appealed. We therefore must decide whether the district court in this case correctly applied the doctrine of collateral estoppel to Century's argument under § 4219.31(c)(1).
 
 
 10
 Collateral estoppel (also called "issue preclusion") refers to the simple principle that "later courts should honor the first actual decision of a matter that has been actually litigated." 18 Charles A. Wright, Arthur R. Miller & Edward H. Cooper, Federal Practice and Procedure § 4416, at 136 (1981 & Supp.1997). It ensures that "once an issue is actually and necessarily determined by a court of competent jurisdiction, that determination is conclusive in subsequent suits based on a different cause of action involving a party to the prior litigation." Montana v. United States, 440 U.S. 147, 153, 99 S.Ct. 970, 973, 59 L.Ed.2d 210 (1979). The prerequisites for the application of collateral estoppel are satisfied when: (1) the issue sought to be precluded is the same as that involved in the prior action; (2) that issue was actually litigated; (3) the determination of the issue was essential to the final judgment; and (4) the party against whom estoppel is invoked was fully represented in the prior action. La Preferida, Inc. v. Cerveceria Modelo, S.A. de C.V., 914 F.2d 900, 906 (7th Cir.1990).
 
 
 11
 Century contends that the second requirement was missing in Century I. It claims that it never had a full opportunity to litigate the validity of § 4219.31(c)(1) because the fund (and summary judgment movant) in that case did not argue the point until its reply brief. It invokes the settled rule that parties may not raise arguments for the first time in reply. In essence, Century is claiming that it was sandbagged and that it never got a chance to convince the district court that the regulation was valid and that it did not conflict with ERISA. But our review of the record tells us that Century itself raised the issue of § 4219.31(c)(1) in its response to the motion for summary judgment, so it was quite natural that any argument concerning that regulation--including its possible invalidity--would be raised by the plaintiff in reply. Century contends that it raised only the application, not the validity, of § 4219.31(c)(1) in its response. But Century is splitting hairs. In defending against the motion for summary judgment by invoking that regulation, Century necessarily was relying on its validity at the same time it was leaving that issue open to attack.
 
 
 12
 Nevertheless, we are not satisfied that the validity of § 4219.31(c)(1), which in fact was never argued by Century (it filed no sur-reply), received the kind of analysis needed to decide such an important issue. For example, in Century I, neither of the parties, nor for that matter the district court, invited the PBGC to participate in the proceeding, presumably to argue in support of its regulation. (The PBGC did not petition to appear as an amicus curiae in this case on appeal, either.) And while the district court determined that the terms of ERISA took precedence over the regulation (citing the rule of law that a statute always trumps a regulation), it did so without hearing from Century on the issue, and without any discussion of conflicting case law and admittedly without any attempt "to reconcile the statute with the regulations." Century I, 1995 WL 699655, at * 4. In light of the sparsity of discussion on the validity issue, the rather late emergence of the issue at the reply brief stage, and the absence of the PBGC entirely, we have doubts that the issue was "actually litigated" in Century I, at least to the extent that it would be entitled to estoppel. Church of the Lukumi Babalu Aye v. City of Hialeah, 508 U.S. 520, 572, 113 S.Ct. 2217, 2247, 124 L.Ed.2d 472 (1993) (Souter, J., concurring) ("[s]ound judicial decisionmaking requires 'both a vigorous prosecution and a vigorous defense' of the issues in dispute") (quoting Christiansburg Garment Co. v. EEOC, 434 U.S. 412, 419, 98 S.Ct. 694, 699, 54 L.Ed.2d 648 (1978)).
 
 
 13
 In all events, we need not decide whether each of the prerequisites for collateral estoppel was met in Century I because Century points us to other reasons not to apply the doctrine in this case. It directs us to Parklane Hosiery Co. v. Shore, 439 U.S. 322, 99 S.Ct. 645, 58 L.Ed.2d 552 (1979), wherein the Supreme Court discussed "non-mutual offensive collateral estoppel"[3] and noted that two circumstances counseled against the application of the doctrine. First, its application could create an incentive for potential plaintiffs "to adopt a 'wait and see' attitude, in the hope that the first action by another plaintiff will result in a favorable judgment," since such plaintiffs "will be able to rely on a previous judgment against a defendant but will not be bound by that judgment if the defendant wins." 439 U.S. at 330, 99 S.Ct. at 651. Second, offensive use of collateral estoppel may be "unfair to a defendant," to the extent that: (1) the defendant may have been sued in the first action for "small or nominal damages" for which "he may have [had] little incentive to defend vigorously"; (2) the "judgment relied upon as a basis for the estoppel is itself inconsistent with one or more previous judgments in favor of the defendant"; or (3) "the second action affords the defendant procedural opportunities [e.g., discovery procedures] unavailable in the first action that could readily cause a different result." Id. at 330-31, 99 S.Ct. at 651-52.
 
 
 14
 None of the Parklane Hosiery factors counsels against the application of collateral estoppel in this case. The fund did not wait to see the result in Century I before filing its lawsuit, so it could hardly be labeled opportunistic. The judgment against Century in Century I exceeded $1.9 million, meaning that it had every incentive to vigorously contest it (though favorably settling the case subsequently may have persuaded it not to appeal). While Century has identified other cases in conflict with the holding in Century I, it was not a party to any of them. And both Century I and this case were decided by district courts at the summary judgment stage, thereby affording Century equivalent procedural opportunities.
 
 
 15
 But a significant exception remains: whether because of "other reasons, the application of offensive estoppel would be unfair." Parklane Hosiery, 439 U.S. at 331, 99 S.Ct. at 651. Under § 29(7) of the Restatement (Second) of Judgments (1981), an issue is not precluded if it is "one of law and treating it as conclusively determined would inappropriately foreclose opportunities for obtaining reconsideration of the legal rule upon which it was based." If the court nevertheless chooses to apply collateral estoppel, it "is foreclosed from an opportunity to reconsider the applicable rule, and thus to perform its function of developing the law." Restatement § 29 Comment i. This consideration is "especially pertinent ... when the issue is of general interest and has not been resolved by the highest appellate court that can resolve it." Id; see United States v. Alcan Aluminum Corp., 990 F.2d 711, 719 (2d Cir.1993) ("[W]here pure questions of law--unmixed with any particular set of facts--are presented to a court, the 'interests of finality and judicial economy may be outweighed by other substantive policies.' ") (citation omitted); Wright, Miller & Cooper, § 4425, at 245 ("There does not appear to be any frequent difficulty in applying the rule that preclusion does not attach to pure questions of law, unmixed with any common elements of fact.").
 
 
 16
 In this case, the district court was faced with a pure legal question, the validity of § 4219.31(c)(1) in light of the provisions pertaining to a contributing employer's default in ERISA. The Supreme Court has not confronted this issue, and neither has this court. But other circuits have had occasion to apply the regulation, and none has suggested that it is invalid as a matter of law. See Board of Trustees No. 15 Machinists' Pension Fund v. Kahle Engineering Corp., 43 F.3d 852, 854-55 (3d Cir.1994); Carriers Container Council, Inc. v. Mobile S.S. Ass'n, 896 F.2d 1330, 1346 n. 29 (11th Cir.1990); ILGWU Nat'l Retirement Fund v. Levy Bros. Frocks, Inc., 846 F.2d 879, 882 (2d Cir.1988). We have stated that determining "whether or not application of collateral estoppel is fair depends upon a case by case analysis," and that courts should be sensitive to the "practical realities which surround the parties." Butler v. Stover Brothers Trucking Co., 546 F.2d 544, 551 (7th Cir.1977).
 
 
 17
 The practical realities here counsel against applying estoppel, even when the district court's decision is reviewed under an abuse of discretion standard. Ross-Berger Companies, Inc. v. Equitable Life Assurance Society, 872 F.2d 1331, 1337 (7th Cir.1989). We note in this regard that the issue of the regulation's validity involves a unique determination of law, and one of general application; that no court prior to Century I (and, to our knowledge, since) held § 4219.31(c)(1) to be invalid; and the decision in Century I fails, at least on its face, to distinguish any case applying the regulation. While it often is difficult to determine whether an issue is one of fact, law, or some mixture of the two, United States v. Stauffer Chemical Co., 464 U.S. 165, 171 n. 4, 104 S.Ct. 575, 579 n. 4, 78 L.Ed.2d 388 (1984), this is not such a case. Neither side has suggested that the issue of the regulation's validity is anything but a purely legal one. While Parklane Hosiery sanctioned the use of nonmutual offensive collateral estoppel, that case involved the relitigation of facts previously resolved adversely to the defendant. We think estoppel is less appropriate where a new plaintiff invokes the doctrine to preclude litigation over a purely legal question, at least where the question is of general interest and some complexity, has not been decided by this court, and was not fully briefed in the first case.
 
 
 18
 We are also concerned about consistency and fairness. Under § 28(2) of the Restatement, an issue is not precluded if it is "one of law and ... (b) a new determination is warranted ... to avoid inequitable administration of the laws." Determining whether preclusion would lead to an "inequitable administration" of law--in this case, ERISA--involves two competing concepts of equality. As Comment c following § 28 explains:
 
 
 19
 One is the concept that the outcomes of similar legal disputes between the same parties at different points in time should not be disparate. The other is that the outcomes of similar legal disputes being contemporaneously determined between different parties should be resolved according to the same legal standards. Applying issue preclusion invokes the first of these concepts, treating temporally separated controversies the same way at the expense of applying different legal standards to persons similarly situated at the time of the second litigation.
 
 
 20
 Here we are concerned about the second concept of equality, i.e., the notion that "outcomes of similar legal disputes ... between different parties should be resolved according to the same legal standards." If we affirmed the district court on the basis of collateral estoppel, we would not be saying that the court in Century I necessarily was correct in concluding that § 4219.31(c)(1) was invalid as a matter of law. And though we would be free in a future case to determine that § 4219 is valid and stays acceleration of withdrawal liability pending arbitration, that determination would apply to everyone but Century. For whatever reason Century did not appeal Century I; it apparently was willing to risk another plaintiff using the decision against them in the future. Nevertheless, such inconsistency in treatment is a concern. Wright, Miller & Cooper, § 4425, at 244 (among "[t]he reasons most commonly advanced [against estoppel] ... [is] that it is particularly unjust to preclude reargument of questions of law that would be open to challenge by other litigants"); Austin Wakeman Scott, Collateral Estoppel by Judgment, 56 Harv. L.Rev. 1, 7 (1942) ("It would manifestly be unjust to apply one rule of law forever as between the parties and to apply a different rule as to all other persons.").
 
 
 21
 This is not a case where a plaintiff seeks to estop a defendant to relitigate a question of fact, or even a mixed question of law and fact unlikely to arise again in exactly the same way. As a pure question of law, the validity of § 4219.31(c)(1) might result in one answer when Century asks the question but another answer when the question is asked by anyone else. As we noted above, the appropriateness of collateral estoppel depends upon the particular practical realities in each case. In this case, those realities lead us to worry less about the dangers of repetitive litigation than about the inconsistency that estoppel would produce. For all of these reasons, the particular circumstances of this case warranted against the application of collateral estoppel. Century should not have been estopped to invoke § 4219.31(c)(1) in the district court even though the court in Century I found the regulation to be invalid.
 
 II.
 
 22
 Though we cannot affirm the district court on the basis of collateral estoppel, the fund asks us to affirm on the merits. See McClendon v. Indiana Sugars, Inc., 108 F.3d 789, 796 (7th Cir.1997) ("We may affirm the judgment of the district court on any sufficient basis that is supported by the record."). We would affirm if we agreed with the court in Century I that § 4219.31(c)(1) necessarily conflicts with the terms of § 1399(c)(5) in a way that makes the two provisions irreconcilable. Robbins v. Bentsen, 41 F.3d 1195, 1198 (7th Cir.1994) ("Regulations cannot trump the plain language of statutes, and we will not read the two to conflict where such a reading is unnecessary.").
 
 
 23
 But the regulation and the statute do not necessarily conflict. 29 U.S.C. § 1399(c)(5) suggests that the fund may require "immediate payment" of a balance if an employer withdraws from the fund, but it is by no means unconditional. If it were, § 1401(a) and (b) would not exist. Section 1401(a)(1) mandates that any dispute under § 1399 "shall be resolved through arbitration." Section 1401(b)(1) states that "[i]f no arbitration proceeding has been initiated ... the amounts demanded by the plan sponsor under section 1399(b)(1) of this title shall be due and owing on the schedule set forth by the plan sponsor." (Emphasis added.) According to the fund, § 1401(b)(1) only reaffirms § 1399(c)(5)--that it may demand immediate payment if the employer does not seek arbitration--and that it says nothing about what a fund can (or cannot) do in a case like this one where an employer does seek arbitration. The fund's reading of § 1401(b)(1) is slightly off course. This section would not exist simply to restate § 1399(c)(5), and courts make it a practice not to read into statutes such redundancies. See Mackey v. Lanier Collection Agency & Service, Inc., 486 U.S. 825, 837, 108 S.Ct. 2182, 2189, 100 L.Ed.2d 836 (1988) (declining to read one section of ERISA in a way that would make it "substantially redundant" with another section because "we are hesitant to adopt an interpretation of a congressional enactment which renders superfluous another portion of that same law"). The better reading of § 1401 is that it conditions acceleration of withdrawal liability on an employer not seeking arbitration. Because the employer did invoke arbitration in this case, the fund should not have accelerated Century's liability.
 
 
 24
 This interpretation is entirely consistent with § 4219.31(c)(1). That regulation states that a "default as a result of failure to make any payments shall not occur until the 61st day after the last of--... (iii) If arbitration is timely initiated ..., issuance of the arbitrator's decision." The rule that emerges from the statute and the regulation is that a fund may accelerate, but not before the arbitrator renders a decision. The regulation would be inconsistent with the statute if it denied the right to accelerate in any circumstance, but it merely delays it, and this delay comports with § 1401(b)(1).
 
 
 25
 This is not a particularly unusual interpretation of the regulation. In fact, while other courts apparently have not been confronted with the exact issue of § 4219.31(c)(1)'s validity, it is clear that they have never questioned it. See Board of Trustees No. 15 Machinists' Pension Fund, 43 F.3d at 855 (citing both § 1399 and 29 C.F.R. § 4219.31(c)(1) and stating that "[i]f an employer misses a scheduled payment, the fund may seek to collect by filing a collection action but it may not accelerate the balance during that protected arbitration period"); Carriers Container Council, Inc., 896 F.2d at 1346 n. 29 ("the [plan] ... sought acceleration of all of CCC's withdrawal liability payments. This relief is unavailable under 29 C.F.R. § 4219.31(c), which does not allow acceleration when a party has sought arbitration."); ILGWU Nat'l Retirement Fund v. Levy Bros. Frocks, Inc., 846 F.2d 879, 882 (2d Cir.1988) (stating that § 4219.31(c)(1) softened a "pay-first-question-later system" by providing that "the plan sponsor cannot consider the employer to be in default and accelerate its demand for payment until the 61st day after the review and arbitration process is complete"); see also James F. Jorden et al., Handbook on ERISA Litigation § 7.03[B], at 7-57 & n. 239 (perm. ed. rev.vol.1994) ("a timely response to a notice of withdrawal liability will prevent a 'default' and acceleration of payment of the withdrawal assessment"; the "employer must, however, still make the interim periodic withdrawal liability payments").
 
 
 26
 On appeal, Century does not contest its duty to make installment payments on its withdrawal liability, though it concedes it failed to make them in this case. Century's concession notwithstanding, the fund submitted additional authority, specifically Galgay v. Beaverbrook Coal Co., 105 F.3d 137 (3d Cir.1997), wherein a court of appeals determined that a preliminary injunction to compel installment payments of withdrawal liability was an appropriate mechanism to ensure such payments. Actually Galgay supports Century's interpretation of the statutory provisions at play, not the fund's. If ERISA funds could accelerate an employer's entire withdrawal liability (even if the employer seeks arbitration), it would make little sense to ask a court to order an employer to make interim payments. In cases like this one, where an employer initially fails to make such payments, funds simply would accelerate the balance owed rather than ask a court to compel payment by a schedule.
 
 
 27
 For these reasons we think the proper interpretation of the statute and the PBGC's regulation is that the fund may exercise its right to an accelerated payment, but acceleration may be delayed if the employer invokes its own right to arbitration. As we have noted, the PBGC was not asked to participate in this suit, and we would have found its input beneficial. Trustees of Iron Workers Local 473 Pension Trust v. Allied Products Corp., 872 F.2d 208, 210 n. 2 (7th Cir.1989) ("The PBGC's views are entitled to deference because of its responsibility to enforce Title IV of ERISA, 29 U.S.C. §§ 1301-1461 (which includes ERISA's withdrawal liability provisions)."); see also Penn Central Corp. v. Western Conference of Teamsters Pension Trust Fund, 75 F.3d 529, 534 (9th Cir.1996) ("We are obligated to defer to the PBGC's interpretation '[e]ven if reasonable minds could differ as to the proper interpretation of the statute.' ") (citation omitted). But even without its participation in this case, it should be safe to assume that the PBGC would not argue for the invalidity of its own regulation.
 
 
 28
 At oral argument the fund suggested that no harm would be done by making an employer like Century pay the accelerated amount prior to arbitration. According to the fund, the entire amount of withdrawal liability would be refunded if the employer prevailed in arbitration. But from a penalty standpoint, even if an employer like Century eventually wins, it loses. As we noted in Central States Pension Fund v. Lady Baltimore Foods, 960 F.2d 1339, 1347 (7th Cir.1992), a fund is entitled to liquidated damages (up to 20% of withdrawal liability) if an employer refuses to pay its liability at least on an installment basis until a court enters a judgment against it. This penalty holds true even if the employer has (as is the case here) timely invoked arbitration. The liquidated damages are separate from the underlying withdrawal liability itself; they relate to the employer's violation of the "pay now, arbitrate later" scheme in ERISA. 960 F.2d at 1347. In this case, even if Century ultimately prevails in arbitration, it will not be able to recoup the liquidated damages assessed against it as a penalty for litigating before paying.
 
 
 29
 So while we are reversing the district court's acceleration of Century's entire withdrawal liability, we agree with the court that the fund is entitled to liquidated damages. These damages penalize Century for deciding not to make installment payments until being ordered to do so by a court. As we noted above, Century tells us that it now agrees that such interim payments are due and owing under ERISA prior to an arbitrator's decision concerning withdrawal liability. But it came to this conclusion late, and accordingly must pay damages as "a penalty for trying to litigate before paying rather than paying [installment payments] upon assessment and litigating to get the payments refunded." Id. Century unpersuasively argues that it should not have to pay any penalty because it relied in good faith on § 4219.31(c)(1). Even if that were true--and we have no reason to doubt that it is--such reliance could not excuse Century's failure to make installment payments. Century's obligation to make installment payments was quite separate from any argument it had under § 4219.31(c)(1) that the fund could not accelerate Century's principal amount of withdrawal liability once it had timely filed for arbitration.
 
 
 30
 We nevertheless agree with Century that its interest and liquidated damages liability should not be based on the entire accelerated assessment made by the district court. Century was obligated only to make installment payments prior to arbitration, and its penalties under 29 U.S.C. § 1132(g)(2) should derive from those missed payments. Therefore, Century's interest liability accrues from the due date of each missed installment payment, and any liability for liquidated damages (either double interest or up to 20% of unpaid contributions, whichever is greater) should relate only to missed installment payments as well. See Carriers Container Council, Inc. v. Mobile Steamship Ass'n, Inc., 948 F.2d 1219, 1223 (11th Cir.1991) ("interest runs from the due date of each respective installment").
 
 
 31
 In sum, Century is obligated to make installment payments pending arbitration of its withdrawal liability dispute with the fund. The district court's accelerated assessment of withdrawal liability is reversed. The issues of interest and liquidated damages are remanded to the district court so that it may enter judgment consistent with this opinion. We affirm the award of attorneys' fees and costs because Century precipitated the plan's suit in the district court by unlawfully failing to make any installment payments pending arbitration.
 
 
 32
 AFFIRMED in part, and R EVERSED and R EMANDED in part.
 
 
 
 [1]
 As amended by the Multiemployer Pension Plan Amendments Act of 1980, 29 U.S.C. § 1381 et seq
 
 
 [2]
 Previously found at 29 C.F.R. § 2644.2(c)(1)
 
 
 [3]
 We concede the term is cumbersome. Offensive use of collateral estoppel occurs when a plaintiff seeks to foreclose a defendant from relitigating an issue the defendant has previously litigated unsuccessfully in another action against the same party (hence, "mutual") or against a different party ("nonmutual"). Defensive use of collateral estoppel--not at play here--occurs when a defendant seeks to prevent a plaintiff from asserting a claim the plaintiff has previously litigated and lost against the same or a different party. See Parklane Hosiery, 439 U.S. at 326 n. 4, 99 S.Ct. at 649 n. 4