**Gus BEVONA, on Behalf of the TRUSTEES OF the BUILDING SERVICE 32B–32J PENSION FUND, Plaintiff,**

v.

**GALBREATH–RUFFIN CORPORATION, et al., Defendants.**

**No. 83 Civ. 7913 (JES).**

United States District Court, S.D. New York.

July 8, 1988.

Manning, Raab, Dealy & Sturm, New York City, for plaintiff, William J. Dealy, Ronald Raab, William D. Reilly, of counsel.

Dretzin & Kauff, P.C., New York City, for defendant Galbreath–Ruffin Corp., Raymond G. McGuire, of counsel.

## OPINION AND ORDER

SPRIZZO, District Judge:

Plaintiff Gus Bevona brings this action on behalf of the trustees of the Building Service Local 32B–32J Pension Fund ("the Fund") pursuant to the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001, et seq., as amended by the Multiemployer Pension Plan Amendments Act of 1980 ("MPPAA"), 29 U.S.C. § 1381, et seq. Named as defendants are Galbreath–Ruffin Corporation ("Galbreath"), one of the employers contributing to the Fund, and a number of individual defendants who are non-union employees or former employees of Galbreath and on behalf of whom Galbreath contributed to the Fund. Plaintiff and defendant Galbreath have agreed to try the issue of liability to the Court on stipulated facts.[1] Thus, this Opinion constitutes the Court's findings of fact and conclusions of law pursuant to Fed.R.Civ.P. 52.

**1.** Although many of the individual defendants have filed answers generally denying the allegations contained in the complaint, they have not otherwise participated in this litigation.

**2.** In the event that the Court determines that Galbreath has no duty to continue to contribute

## BACKGROUND

Galbreath is a member of the Realty Advisory Board ("RAB"), a multiemployer association which represents various real estate owners and their managing agents throughout the City of New York. Stipulation of Facts and Order ("Stip.") at ¶ 4. As a member of RAB, Galbreath was a party to various collective bargaining agreements which RAB signed on its behalf with Local 32B–32J, Service Employees International Union, AFL–CIO ("the Union"). Id. at ¶ 5. Pursuant to these agreements, Galbreath in 1956 began contributing on behalf of its covered employees to the Fund, a multiemployer pension fund. Id. at ¶¶ 1, 6; see 29 U.S.C. § 1002(2) & id. at § 1002 (37). Galbreath has continued to make these contributions on behalf of its union-represented employees. Id. at ¶ 7.

From 1958 to 1981, Galbreath also contributed to the fund on behalf of certain categories of "non-union" employees, i.e., employees not represented by the Union. Stip. at ¶¶ 8, 20. However, by letter dated May 13, 1981, Galbreath notified the Fund that it was withdrawing its non-union employees from the fund effective April 30, 1981. Id. at ¶ 19; see also id. Ex. K. On May 1, 1981, as previously announced, Galbreath stopped making contributions on behalf of its non-union employees. Stip. at ¶ 20. Thereafter, the Fund brought this action, seeking inter alia a declaration as to the existence of "an enforceable agreement between the Fund and Galbreath–Ruffin by which Galbreath–Ruffin can be forced to continue making contributions for Galbreath–Ruffin's aforementioned non-union employees to the Fund." Complaint at ¶ 44(1).[2] For the reasons that follow, the Court concludes that no such agreement exists.

## DISCUSSION

The Fund claims that Galbreath is obligated to make contributions on behalf of

to the Fund on behalf of its non-union employees, the complaint seeks additional declaratory relief. See Complaint ¶ 44. The complaint also seeks damages based on theories of breach of contract, estoppel, and unjust enrichment. See id. at ¶¶ 45–67.

235

its non-union employees for as long as it is required to contribute for its union employees pursuant to any collective bargaining agreement. *See* [Plaintiff's] Memorandum of Law ("Pl. Mem.") at 1. Galbreath, however, argues that because there is no written or oral agreement requiring contribution for non-union employees for a time certain, it properly exercised its discretionary right to discontinue coverage for its non-union employees. *See* [Defendant Galbreath's] Memorandum of Law ("Def. Mem.") at 17. In order to resolve this dispute, it is necessary to examine the various documents governing Galbreath's obligation to contribute to the Fund.

■ As noted above, the relevant collective bargaining agreement ("CBA") was executed by the Union and by RAB on behalf of its members, including Galbreath, and establishes the wages, hours, and working conditions of covered, *i.e.,* union-represented, employees.[3] Article XI(B)(1) of the CBA indicates that the Fund trustees have the power "to revise the amounts of the pension benefits and the conditions under which benefits will be paid and to continue to cover such employees of other Employers in or connected with the industry for whom contributions are paid, provided such coverage is in compliance with the law and the Trust Agreement." Stip. Ex. A, Art. XI(B)(1), at 35. The Fund argues that the reference to "such employees of other Employers" supports an inference that the parties intended that pension coverage be required for non-union employees and that therefore contributions had to be made on behalf of those employees. *See* Pl. Mem. at 10. However, as defendant Galbreath correctly notes, this language merely empowers the trustees "to continue to cover such employees"; it does not require the employers to make contributions on behalf of those employees. *See* Def. Mem. at 19.

Moreover, immediately following this language, the CBA sets levels of contributions that must be paid into the Fund for "regular" union employees. *See* Stip. Ex. A, Art. XI(B)(2) & (3), at 35. The absence of any reference to the amount of contributions to be made on behalf of non-union employees strongly weighs against the Fund's argument that the CBA imposes on Galbreath any obligation to contribute to the Fund on behalf of those employees.

The Trust Agreement referred to in the CBA likewise fails to support the Fund's position, for it provides that "[e]ach contributing Employer shall contribute to the Fund the contributions required by the applicable Collective Bargaining Agreement ..." Stip. Ex. B at ¶ 3. As already noted, the CBA does not impose on employers any duty to make contributions on behalf of non-union employees.

■ Nor does the Pension Plan impose upon employers any obligation to contribute on behalf of non-union employees, although it does make reference to non-union employees. The Plan includes within the definition of "employee" an employee of a collective bargaining employer who is not covered by a collective bargaining agreement but is employed in a category of building service, maintenance, or operation which the trustees unanimously agree should be covered, and with respect to which category the employer *has agreed, in writing,* to make contributions. Stip. Ex. C at § 1.11(a)(iii). The Plan also provides that the rate of contribution for employees "not covered under a collective bargaining agreement with the Union" is to be the same as the rate established by the collective bargaining agreement for union employees. *See id.* at § 3.01.

It is significant, therefore, that although the Plan expressly addresses the rate of contributions for non-union employees, it

---

**3.** The Fund does not and cannot claim that the non-union employees on whose behalf the terminated contributions were made were covered by the collective bargaining agreement. *See* Pl. Mem. at 10; *compare Clark v. Ryan,* 818 F.2d 1102, 1102–06 (4th Cir.1987); *Byrnes v. DeBolt Transfer, Inc.,* 741 F.2d 620, 622–24 (3d Cir. 1984). Indeed, the evidence clearly is to the contrary. *Compare* Stip. Ex. A, Preface & Art. I, at 5 (CBA applies to classifications of building service employees) and *id.,* Art. XVII (27), at 66–67 (definition of jobs) *with* Ex. E (letter from trustees to employers, providing for coverage of employees not represented by Union); *see also* Pl. Mem. at 28 (distinguishing between building service employees and corporate staff).

nowhere imposes upon employers a duty to make such contributions. Moreover, the Plan clearly requires that the employer agree, in writing, to make such contributions in order for a non-union employee even to come within the Plan's definition of "employee." *See id.* at § 1.11(a)(iii). Furthermore, the Plan also provides that "[e]xcept for liabilities which may result from provisions of ERISA, nothing in this Plan shall be construed to impose any obligation to contribute beyond the obligation of the Employer to make contributions as stipulated in its collective bargaining agreement with the Union." *Id.* at § 8.02. The existence of these provisions coupled with the absence of any written provision *requiring* an employer to contribute on behalf of employees not covered by the CBA leads inevitably to the conclusion that no such obligation exists.

█ The Fund also relies heavily on a letter dated November 20, 1979 that it sent to all contributing employers. *See* Pl. Mem. at 18–21; Stip. at ¶ 11. This letter advised contributing employers that the trustees of the Fund had adopted five "requirements" for coverage of non-union employees. *See* Stip. Ex. E.[4] However, not only does that letter not support the claim that Galbreath was obliged to make contributions on behalf of non-union employees, it in fact supports the opposite conclusion.

Indeed, that letter specifically requested Galbreath to manifest its consent to the terms of the proposed agreement by signing and returning the letter. Galbreath

failed to do either and indeed made no response to the letter whatsoever. Rather, Galbreath merely continued to make contributions to the Fund on behalf of certain categories of its non-union employees, including employees hired subsequent to November 20, 1979. Stip. at ¶¶ 12–13. The Fund did not object to these contributions or otherwise comment on Galbreath's failure to return the letter. In the face of these clear manifestations of Galbreath's intent not to be bound by the terms of the letter, the Court cannot and does not conclude that there was any agreement by Galbreath to those terms. *Id.* at ¶ 14.

The Fund also argues that although the letter refers to itself as "this letter agreement," and a line is included in the letter for the employer's signature above the word "Agreed," *see* Stip. Ex. E, the letter was not a proposal for an agreement but rather merely a notice of a resolution adopted by the trustees at a meeting on October 11, 1979 pursuant to Article XI(B)(1) of the CBA and Paragraph Sixth of the Trust Agreement. *See* Pl. Mem. at 2. However, even assuming that the trustees had the power to pass a resolution requiring employers to contribute to the Fund on behalf of non-union employees, a proposition highly dubious at best, the undisputed facts indicate that the trustees did not in fact adopt such a resolution.

The minutes of the October 11 trustees' meeting establish that the trustees unanimously adopted only legal counsels' "recommended procedure for the participation of specific employees in the plan as out-

---

**4.** The body of the letter reads as follows:

The Trustees of the Building Service 32B–J Health and Pension Funds have adopted the following requirements for coverage of employees under these Funds who are not covered under the agreement with Local 32B–32J or Local 164:

1) The employer warrants it is signatory to the collective bargaining agreement for its building service employees.

2) The Employer agrees that the employees to be covered are not in categories of employment presently or previously represented by Local 32B–32J or Local 164.

3) The Employer agrees to make the same contributions as are required by the collective bargaining agreement with Local 32B–32J or Local 164.

4) The Employer has attached to this letter agreement a list of all categories to be covered and all employees in such categories and agrees that all employees in such categories are in fact covered and will continue to be covered.

5) The Employer agrees to supply all necessary information to the Fund and to allow its books to be audited in the same manner as any other contributing employer.

If this meets with your agreement, please sign a copy and return it to the Fund office together with the list required by paragraph 4.

Stip. Ex. E. At the bottom of the letter below the signature of the writer, a line is provided for the signature of an agent of the contributing employer and beneath that line is the word "Agreed." *See id.*

lined" in an attached exhibit. Stip. Ex. D at ¶ VI. The exhibit referred to is a memo to the trutees from legal counsel which recommends "that the Trustees adopt the following requirements and procedures" concerning certain white collar employees that employers wish to be covered by the Fund. *Id.* at 3. The memo then lists essentially the same five points listed in the November 20 letter. *See id.* More importantly, the memo provides that "[t]he employer must agree in writing to make the same contributions as required by the collective bargaining agreement." *Id.* This language, taken together with the letter's agreement format, makes it clear that the trustees did not view their "resolution" as binding on the employees, but merely as an offer by the trustees to effectuate a change in the Plan if agreed to by the contributing employers.[5]

Furthermore, this interpretation of the letter and the October 11 minutes is also supported by a subsequent letter to Galbreath written by Marvin Dicker, co-counsel to the Fund and one of the co-authors of the memo to the trustees discussed above. *See* Stip. at ¶¶ 15–16 & Exs. D & H. That letter provides that "[s]ubject to any written agreements [Galbreath] might have directly with the union and/or the Pension Plan, [Galbreath] can elect to cease making contributions and terminate coverage for all the employees in any category [of non-union employees]." Stip. Ex. H. Thus, it is clear that Mr. Dicker, who co-authored the memo adopted by the trustees, did not believe that the trustees had passed a binding resolution.[6]

■ Thus, none of the documents discussed above, either alone or in combination, require Galbreath to make contributions to the Plan on behalf of non-union employees. *Compare I.A.M. Nat'l Pension Fund v. Electroline Mfg. Co.,* No. 85 Civ. 1994 (D.D.C. Jan. 25, 1988) [available on WESTLAW, 1988 WL 84187]. Nor does ERISA impose upon Galbreath an independent duty to make such contributions.[7] In-

---

5. The Fund also argues that even if the letter constituted only an offer of agreement and not notice of a binding resolution, Galbreath either accepted the offer by its silence or is estopped from denying the obligation the letter sought to impose. *See* Pl. Mem. at 20–21. These arguments are clearly without merit and do not warrant extensive discussion. Since the letter specifically requested Galbreath to manifest its consent by signing and returning the letter, Galbreath's silence and failure to return the letter cannot be reasonably regarded as a tacit acceptance of the terms of the letter. For the same reasons the Fund could not have reasonably relied on Galbreath's inaction as an indication that it accepted the payment. It is thus clear that there is no conceivable support for the Fund's estoppel claim, even assuming arguendo that the application of that concept is not preempted by ERISA.

6. The Fund argues that the November 20 letter provides that employers must contribute for non-union employees as long as they have a duty to contribute for union employees, apparently relying on requirement 4 of the letter, which states:

> The Employer has attached to this letter agreement a list of all categories to be covered on all employees in such categories and agrees that all employees in such categories are in fact covered and will continue to be covered.

Stip. Ex. E. Galbreath, on the other hand, interprets this language as providing that coverage for an individual employee in a category can continue only as long as all employees in that category are covered. *See* Def. Mem. at 32–33. In light of Mr. Dicker's letter discussed above, the Court agrees with Galbreath's interpretation. That letter provides, *inter alia:*

> Non-union employees who are covered under the Plan may be covered only if all of the employees in a particular category are in fact covered. If you withdraw any single employee in a category, coverage cannot be continued for the other employees in that category.

Stip. Ex. H. Thus, even if Galbreath is bound by the terms of the November 20 letter, the Court finds that that letter does not impose on Galbreath a duty to continue to contribute for its non-union employees as long as it must contribute on behalf of its union employees.

7. Neither party has ever argued that ERISA imposed any obligation on Galbreath to continue making contributions for non-union employees. Moreover, although the Fund initially advised Galbreath that its action had triggered withdrawal liability, *see* Stip. at ¶ 21 & Ex. L, the Fund never demanded payment and now specifically disclaims the applicability of MPPAA withdrawal liability, *see* Pl. Mem. at 28; [Plaintiff's] Proposed Findings of Fact and Conclusions of Law at 7. Thus, the Court need not determine whether the facts of this case implicate withdrawal liability or whether arbitration of that issue is required. *Compare ILGWU Nat'l Retirement Fund v. Levy Bros. Frocks, Inc.,* 846 F.2d 879 (2d Cir.1988).

deed, ERISA's requirement that an employer contribute to a multiemployer plan is contingent upon an obligation to contribute arising "under the terms of the plan or under the terms of a collectively bargained agreement." 29 U.S.C. § 1145. Thus, ERISA does not obligate an employer to make contributions for employees not covered in the collective bargaining agreement or in any other agreement. *See Indiana State Council of Roofers Health and Welfare Fund v. Adams Roofing Co.*, 753 F.2d 561, 563–64 (7th Cir.1985).[8]

## CONCLUSION

For the reasons set forth *supra*, the Court concludes that plaintiff has failed to establish that defendant Galbreath has any obligation to contribute to the Fund on behalf of its non-union employees. Thus, the Clerk of the Court shall dismiss the complaint and enter judgment in all respects in favor of defendant Galbreath.

It is SO ORDERED.

---

**8.** As noted earlier, *see supra* note 1, the Fund has requested the Court to render additional declaratory relief on a variety of issues if it determines that Galbreath has no duty to continue making contributions on behalf of its non-union employees. It is clear, however, that the declaratory judgment statute does not extend the jurisdiction of the Court. *See, e.g., Skelly Oil Co. v. Phillips Petroleum*, 339 U.S. 667, 671–72, 70 S.Ct. 876, 879, 94 L.Ed. 1194 (1950). Thus, declaratory relief is appropriate only where an actual controversy exists between parties having adverse legal interests of sufficient immediacy and reality to warrant judicial resolution. *See, e.g., Maryland Casualty Co. v. Pacific Coal & Oil Co.*, 312 U.S. 270, 272–73, 61 S.Ct. 510, 511–12, 85 L.Ed. 826 (1941). For the reasons that follow, the Court concludes that only the question of whether Galbreath is obligated to continue to contribute to the Fund on behalf of its non-union employees meets this test.

Although the Fund seeks declaratory relief as to whether the contributions already paid by Galbreath on behalf of its non-union employees meet the requirements of § 302(c) of the Labor Management Relations Act of 1947, 29 U.S.C. § 186(c), neither party contends that these requirements were not met. *See* Pl. Mem. at 6–8; Def. Mem. at 52. Thus, there is no actual controversy with respect to this issue and the Court is without jurisdiction to render the relief requested. For the same reason, neither the issue of whether Galbreath had the right to contribute to the Fund for its non-union employees or whether the Fund had the right to properly accept those contributions is properly before the Court. Finally, although the non-union employees have been named as defendants, none of the allegations of the complaint support an inference that there is a current dispute between the Fund and Galbreath's current or former non-union employees regarding those employees' rights to collect benefits from the Fund. It follows that the Fund's request for a declaration of the rights and obligations between the Fund and those employees is also premature. Thus, to the extent the first count of the complaint seeks declaratory relief regarding these issues, it is dismissed without prejudice.