**AMALGAMATED LITHOGRAPHERS OF AMERICA Lithographic Industry Pension Plan, Plaintiff,**

v.

**UNZ & CO. INCORPORATED, Defendant.**

**No. 08 Civ. 7046(CM).**

United States District Court, S.D. New York.

Nov. 3, 2009.

Thomas Martin Kennedy, John Reed Howard, Kennedy, Jennik & Murray, P.C., New York, NY, for Plaintiff.

Aaron C. Schlesinger, Peckar & Abramson, P.C., New York, NY, for Defendant.

McMAHON, District Judge.

### Introduction

Plaintiff, the Amalgamated Lithographers of America Lithographic Industry Pension Plan (the "Plan"), moves for summary judgment against defendant Unz & Co., Inc. ("Unz"), on its claim for withdrawal liability arising under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 et seq., as amended by the Multiemployer Pension Plan Amendments Act ("MPPAA"). Unz opposes the motion, and cross-moves for summary judgment dismissing the Plan's action or, in the alternative, compelling arbitration to settle the dispute. For the reasons set forth below, plaintiff's motion is GRANTED, and defendant's cross-motion is DENIED.

### Background

The basic facts underlying this case are not in dispute. They are taken from Plaintiff's Rule 56.1 Statement of Uncontested Material Facts in Support of Motion for Summary Judgment ("Pl. Rule 56.1 Stmt.") and Defendant's Reply to Plaintiff's Local Rule 56.1 Statement ("Def. Rule 56.1 Reply."). The Court *sua sponte* strikes Defendant's Counterstatement of Undisputed Material Facts. It is nothing of the sort. Very little of it is statements of fact; for the most part, it is legal argument. To the extent in contains any "statements of fact," it merely duplicates Defendant's Rule 56.1 Reply.

The Plan is an "employee pension benefit plan" as defined by ERISA. (Pl. Rule 56.1 Stmt. ¶ 1). The Plan is a "multiemployer plan" as defined by ERISA, and is designed to provide retirement and other benefits to eligible participants and beneficiaries. (Id. ¶¶ 2–3.) Scott Printing Corp. ("Scott Printing") was an employer as defined by ERISA. (Id. ¶ 4.)

Scott Printing was a commercial printing company, with facilities located in New Providence, New Jersey and at 55 Broadway, New York (also known as 1 Exchange Place). (Id. ¶ 5.) Scott Printing was a member of the Metropolitan Lithographers of America ("MLA"), an employer bargaining association. As such, it was

bound by the provisions of the collective bargaining agreement between Union Local 1–L, Lithographers of America, GCIU ("Local 1") and the MLA during Scott Printing's membership with MLA. (Pl. Rule 56.1 Stmt. ¶¶ 6–7; Def. Rule 56.1 Reply ¶¶ 6–7.) Under the collective bargaining agreement between MLA and Local 1, Scott Printing was required to make regular contributions to the plan. (Pl. Rule 56.1 Stmt. ¶ 8.)

On January 17, 2003, Scott Printing ceased operations. Daniel Scott, the president of Scott Printing, sent a letter to the employees of the company, stating that Scott Printing was shutting down production, and that there was no reason to expect it would reopen in the future. (Pl. Rule 56.1 Stmt. ¶¶ 9–11.) In two letters sent within the following month, counsel for Scott Printing advised counsel for the Plan and Local 1 that the company had ceased operations, that it had no money, and that it would not respond to the Plan's lawsuits or demands for collection. (Pl. Rule 56.1 Stmt. ¶¶ 12–14.) Based on the shutdown and these communications, the Plan determined that Scott Printing had completely withdrawn from the Plan. (Pl. Rule 56.1 Stmt. ¶ 15.)

There is some confusion about the date when it was determined that Scott Printing completely withdrew from the Plan. As will be further discussed below, both the Complaint and letters from the Plan dated January 3, 2005 identify January 24, 2003 as the withdrawal date. (Declaration of Aaron C. Schlesinger, Esq. Submitted in Opposition to Plaintiff's Motion for Summary Judgment and in Support of Defendant's Cross–Motion for Summary Judgment ("Schlesinger Decl.") Ex. A, E–G.) In its Rule 56.1 Statement and in a letter dated November 29, 2004, the Plan states that Scott Printing withdrew on January 17, 2003. (Schlesinger Decl. Ex, D.) However, this discrepancy in dates appears to be due more to sloppiness on the part of plaintiff's counsel rather than to any genuine issue of material fact; it has no bearing on the resolution of the case.

At the time Scott Printing ceased operations, Daniel Scott and his brother Walter Scott, Jr., owned 100% of Scott Printing stock: Daniel owned 75%, while Walter owned 25%. (Pl. Rule 56.1 Stmt. ¶ 25; Def. Rule 56.1 Reply ¶ 25.)

The Plan's actuaries calculated Scott Printing's final withdrawal liability amount under ERISA at $765,474. (Pl. Rule 56.1 Stmt. ¶ 18; Def. Rule 56.1 Reply ¶ 18.) In accordance with the procedure for collecting withdrawal liability under 29 U.S.C. § 1399, the Plan sent letters via certified registered first class mail on January 3, 2005, addressed to Scott Printing at three addresses: 1 Exchange Place, New York, New York, 10006; 55 Broad Street, New York, New York, 10004; and 55 Broadway, New York, New York, 10006. (Pl. Rule 56.1 Stmt. ¶ 21; Declaration of Howard Savlick ("Savlick Decl.") Ex. I–K.) These letters demanded payment of withdrawal liability in the amount of $765,474, accompanied by a proposed schedule for quarterly payments to the Plan. (Pl. Rule 56.1 Stmt. ¶ 19; Savlick Decl. Ex. I–K.) It is undisputed that none of these letters was received; all were returned to sender. (Pl. Rule 56.1 Stmt. ¶ 22; Savlick Decl. Ex. L–N.)

Nonetheless, the Plan sent another letter to the 55 Broad Street address on April 28, 2005, advising Scott Printing that it was in default of the first scheduled withdrawal liability payment. The letter said that if Scott did not cure the default, the entire withdrawal liability amount would become due and owing. (Pl. Rule 56.1 Stmt. ¶ 23; Savlick Decl. Ex. O.) This letter likewise was returned to sender unopened. (Pl. Rule 56.1 Stmt. ¶ 24; Savlick Decl. Ex. P.)

The Plan did not send a letter to Scott Printing's operating facility in New Providence, New Jersey.

During discovery, plaintiff produced a copy of a letter dated November 29, 2004, addressed to Scott Printing at 55 Broad Street. (Schlesinger Decl. Ex. D.) This letter purported to notify Scott that its "withdrawal liability" totaled $47,160, "pursuant to the enclosed analysis." The letter was not accompanied by any "enclosed analysis." Plaintiff asserts that this document was never sent, and that the amount of withdrawal liability stated is far too low. No return receipt has been found for any letter dated November 2004 (plaintiff's policy is to send demand letters "return receipt requested."). Defendant does not offer any evidence that it saw this document prior to the time it was produced in discovery.

Unz is a training, software, and publishing company, specializing in advising businesses on compliance with regard to the import and export of hazardous materials. (Pl. Rule 56.1 Stmt. ¶ 26.) Daniel Scott is the president of Unz. At the time Scott Printing ceased operations, Daniel and Walter Scott Jr. together owned 100% of the shares of Unz, with Daniel again owning 75% and Walter Jr. owning 25%. (Pl. Rule 56.1 Stmt. ¶¶ 26–27; Affidavit of Daniel T. Scott Submitted in Opposition to Plaintiff's Motion for Summary Judgment and in Support of Defendant's Cross–Motion for Summary Judgment ("Scott Aff.") ¶ 1.)

Unz was originally located at 700 Central Avenue, New Providence, New Jersey—the same location as Scott Printing's New Jersey facility. (Scott Aff. ¶ 11.) In January 2003, Unz moved to a new location in Bound Brook, New Jersey, and in June 2006, moved to 201 Circle Drive North, Piscataway, New Jersey—its current address. (Id. ¶ 12.)

On May 19, 2008—over five years after Scott ceased operations, and three years after the Plan's unsuccessful attempt to contact Scott Printing—the Plan sent a letter to Unz, informing Unz that a "routine review of Plan files" had raised the question of whether Unz and Scott Printing were members of a "controlled group" (as defined by ERISA) at the time Scott Printing ceased operations. The letter asked for information regarding ownership of Unz stock during the three years prior to Scott Printing's withdrawal from the Plan. (Pl. Rule 56.1 Stmt. ¶¶ 28–30; Savlick Decl. Ex. T.) The May 19,2008 letter was accompanied by a copy of the letter sent to Scott Printing on January 3, 2005. (Pl. Rule 56.1 Stmt. ¶ 30; Savlick Decl. Ex. T.) It is undisputed that Unz received the May 19, 2008 letter. (Pl. Rule 56.1 Stmt. ¶ 31; Def. Rule 56.1 Reply ¶ 31.)

Unz did not respond to the May 19, 2008 letter. (Pl. Rule 56.1 Stmt. ¶ 32; Def. Rule 56.1 Reply ¶ 32.) On August 7, 2008, more than 60 days after the letter was sent, the Plan commenced this action by filing the Complaint, and on August 13, 2008, the Plan served Unz with the Summons and Complaint. Attached to the Complaint as exhibits were copies of both the January 3, 2005 letter to Scott Printing and the May 19, 2008 letter to Unz. (Pl. Rule 56.1 Stmt. ¶ 33–34.)

The Complaint demands judgment in the sum of $765,474, representing the calculated withdrawal liability, as well as other damages allowed for in ERISA, including interest on that amount, liquidated damages, and attorneys fees and costs.

After answering the Complaint and denying liability, Unz served "Defendant's First Set of Interrogatories" on the Plan. (Schlesinger Decl. Ex. C.) Among other things, Unz requested "a detailed analysis regarding Plaintiff's calculation of withdrawal liability against Scott Printing

and/or Defendant and copies of all documents used in performing the calculation." (Id. ¶ 3.) Unz received the Plan's initial response on January 3, 2009, consisting of documents responsive to the request—including copies of the November 29, 2004, the three January 3, 2005, and the April 28, 2005 letters. (Id. ¶ 13.)

Unz followed up with a letter on January 22, 2009, requesting copies of all return receipt cards for the documents produced by the Plan in response to their earlier request. (Id. Ex. J.) The requested cards were provided via a letter sent from the Plan on February 4, 2009. As noted above, there was no return receipt card for the November 29, 2004 letter. The Plan also served its interrogatory responses at that time. (Id. Ex. K.)

Unz sent a letter on February 9, 2009, requesting the return receipt card for the November 29, 2004 letter, as well as an explanation of why the amounts of withdrawal liability indicated in the November 29, 2004 letter ($47,160) differed from the withdrawal liability in the January 3, 2005 letters ($765,474). (Id. Ex. N.) On February 18, 2009, the Plan responded with a letter stating that it had no return receipt for the November 29, 2004 letter; that the attorney who drafted the November 2004 letter (Ira Cure) did not recall the letter; that Mr. Cure did not recall how he arrived at the amount of withdrawal liability contained in the letter; that counsel for the Plan spoke to employees of the firm who conducted the withdrawal liability calculation, who assured counsel the January 3, 2005 amount was correct; and that those employees and Mr. Cure were available for depositions. (Id. Ex. O.) It does not appear that anyone has been deposed.

On January 16, 2009, the Plan filed a motion to amend/correct the complaint; it sought to add Daniel Scott as a defendant and amend the complaint to reflect transactions and events uncovered during discovery. (Docket No. 8.) This motion was fully briefed by both sides, and the Court granted it on April 22, 2009. (Docket No. 32.)

On May 6, 2009, the parties jointly submitted a letter, subsequently endorsed by the Court, asking that any "further action" relating to the amended complaint be "held in abeyance" pending the outcome of the summary judgment motions. (Docket No. 35.) No one asked for reconsideration and the Court has not withdrawn its April 22 order, so as far as I am concerned Daniel Scott is a party defendant in this action.

The Plan filed its motion for summary judgment against Unz on March 27, 2009. Unz filed its response, and a cross-motion for summary judgment in its favor, on April 20, 2009.

### Discussion

### A. STANDARD FOR SUMMARY JUDGMENT

A party is entitled to summary judgment when there is no "genuine issue of material fact" and the undisputed facts warrant judgment for the moving party as a matter of law. Fed.R.Civ.P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In addressing a motion for summary judgment, "the court must view the evidence in the light most favorable to the party against whom summary judgment is sought and must draw all reasonable inferences in [its] favor." *Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Whether any disputed issue of fact exists is for the Court to determine. *Balderman v. United States Veterans Admin.*, 870 F.2d 57, 60 (2d Cir.1989). The moving party has the initial burden of demonstrating the absence of a disputed issue of material fact. *Celotex v. Catrett*,

477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once such a showing has been made, the non-moving party must present "specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). The party opposing summary judgment "may not rely on conclusory allegations or unsubstantiated speculation." *Scotto v. Almenas,* 143 F.3d 105, 114 (2d Cir.1998). Moreover, not every disputed factual issue is material in light of the substantive law that governs the case. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude summary judgment," *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505. Finally, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Industries Co.,* 475 U.S. at 586, 106 S.Ct. 1348. To withstand a summary judgment motion, sufficient evidence must exist upon which a reasonable jury could return a verdict for the nonmovant.

## B. ERISA WITHDRAWAL LIABILITY: THE STATUTORY SCHEME

■ Congress enacted ERISA in 1974. As explained by the Supreme Court, among the principal purposes of the statute was,

> [T]o ensure that employees and their beneficiaries would not be deprived of anticipated retirement benefits by the termination of pension plans before sufficient funds have been accumulated in the plans. Congress wanted to guarantee that if a worker has been promised a defined pension benefit upon retirement—and if he has fulfilled whatever conditions are required to obtain a vested benefit—he actually will receive it.

*Pension Benefit Guaranty Corporation v. R.A. Gray and Co.,* 467 U.S. 717, 720, 104 S.Ct. 2709, 81 L.Ed.2d 601 (1984) (internal quotation marks and citations omitted). The MPPAA was enacted in 1980 based on Congressional and agency findings that "ERISA did not adequately protect plans from the adverse consequences that resulted when individual employers terminate their participation in, or withdraw from, multiemployer plans." *Id.* at 722, 104 S.Ct. 2709. The amendments were designed to reduce the incentive for employers to withdraw from multiemployer plans and to lessen the impact and burdens on plans when employers do withdraw. *Id.* at 724, n. 3, 104 S.Ct. 2709; *Korea Shipping Corp. v. New York Shipping Ass'n–Int'l Longshoremen's Ass'n Pension Trust Fund,* 880 F.2d 1531, 1537 (2d Cir.1989). To that end, the MPPAA "requires that an employer withdrawing from a multiemployer pension plan pay a fixed and certain debt to the pension plan. This withdrawal liability is the employer's proportionate share of the plan's 'unfunded vested benefits,' calculated as the difference between the present value of vested benefits and the current value of the plan's assets." *Gray,* 467 U.S. at 725, 104 S.Ct. 2709 (citations omitted).

The MPPAA provides a comprehensive statutory scheme governing withdrawal from multiemployer pension plans. When an employer withdraws from a plan (withdrawal being defined in 29 U.S.C. § 1383 and 29 U.S.C. § 1385), the plan sponsor must determine the amount of liability and notify the employer of the amount. 29 U.S.C. § 1382. The employer must be notified "as soon as practicable" after withdrawal, and the notice must include the amount of the liability, a schedule for liability payments, and a demand for payment in accordance with the schedule. 29 U.S.C. § 1399(b)(1). Once the employer receives notice, it must begin payment in accordance with the schedule within 60 days, "notwithstanding any request for review or appeal of determinations of the amount of such liability or of the schedule." 29 U.S.C. § 1399(c)(2). We will re-

fer to this as the statute's "pay now-fight later" clause.

Within 90 days after receiving notice, the employer "(i) may ask the plan sponsor to review any specific matter relating to the determination of the employer's liability and the schedule of payments, (ii) may identify any inaccuracy in the determination of the amount of the unfunded vested benefits allocable to the employer, and (iii) may furnish any additional relevant information to the plan sponsor." 29 U.S.C. § 1399(b)(2)(A). After a "reasonable review of any matter raised," the plan shall notify the employer of its decision, the basis for its decision, and the reason for any change in its determination of liability or schedule of payments. 29 U.S.C. § 1399(b)(2)(B). Regardless of whether any such review is requested and received, the employer is obligated to begin payment within 60 days of notification. 29 U.S.C. § 1399(c)(2).

Any dispute concerning the plan's assessment of liability must be settled through arbitration. 29 U.S.C. § 1401(a)(1). Either party may initiate arbitration, but it must do so by the earlier of (i) 60 days after notification to the employer of the plan's post-review decision under § 1399(b)(2)(B), or (ii) 180 days after the date of the employer's request for review under § 1399(b)(2)(A). 29 U.S.C. § 1401(a)(1). In addition, the parties may jointly initiate arbitration within 180 days after the plan's initial demand for payment under § 1399(b)(1). 29 U.S.C. § 1401(a)(1).

If no arbitration proceeding is initiated within these timeframes, then the amount demanded by the plan becomes final and must be paid in accordance with the schedule provided by the plan. 29 U.S.C. § 1401(b)(1). Failure to demand arbitration within the statutory time frame bars the employer from contesting liability for the amount demanded. 29 U.S.C.

§ 1401(a)(1), (b)(1); *ILGWU National Retirement Fund v. Levy Bros. Frocks, Inc.,* 846 F.2d 879, 885–87 (2d Cir.1988).

If the employer defaults in making payments pursuant to the schedule, the plan may require immediate payment of the entire unpaid amount of the employer's withdrawal liability, plus accrued interest on the total outstanding liability from the date of the first scheduled payment that was not timely made. 29 U.S.C. § 1399(c)(5). A "default" is defined for purposes of this section as: 1) the failure of an employer to make a scheduled payment, when that failure is not cured within 60 days after written notification from the plan of the failure; or 2) any event defined in rules adopted by the plan that indicates a "substantial likelihood" that the employer will be unable to pay withdrawal liability. 29 U.S.C. § 1399(c)(5)(A) and (B).

## C. WITHDRAWAL LIABILITY: WHO IS RESPONSIBLE

### 1. Scott Printing is Responsible as Employer

ERISA has been described as "famously complicated and often tedious." *Chicago Truck Drivers v. El Paso CGP Co.,* 525 F.3d 591, 595 (7th Cir.2008). While this may be true in general, with respect to withdrawal liability one thing is abundantly clear—the MPPAA establishes a "pay now-fight later" system, where an employer who receives notice of withdrawal liability must start making payments within 60 days, whether it believes it is liable for the amount demanded or not. *Bowers v. Transportacion Maritima Mexicana,* 901 F.2d 258, 263 (2d Cir.1990) (*citing Levy Bros. Frocks,* 846 F.2d at 882); *see* 29 U.S.C. § 1399(c)(2) ("Withdrawal liability shall be payable in accordance with the schedule set forth by the plan sponsor ... beginning no later than 60 days after the date of the demand notwith-

standing any request for review or appeal of determinations of the amount of such liability or of the schedule.").

Defendant does not dispute that Scott Printing was an employer within the meaning of ERISA. Likewise, there is no dispute that neither Scott Printing nor Unz has made any payments to the Plan towards the calculated withdrawal liability.

*2. Unz and Scott Printing are Businesses Under Common Control, So Unz Can Be Held Liable for Scott's Withdrawal Liability*

■ Businesses that are under "common control" (also referred to as businesses that are members of a control group) are treated as a single employer for purposes of ERISA withdrawal liability. 29 U.S.C. § 1301(b)(1). Common control is defined under § 1301(b)(1) by reference to Treasury Regulations prescribed under 26 U.S.C. § 414(c). Included within the definition of common control in those regulations are so-called "brother-sister" corporations, defined as two or more corporations where the same five or fewer people 1) own at least 80 percent of the total stock of the corporation, and 2) own at least 50 percent of the total stock of the corporation, taking into account the ownership of each person only to the extent such ownership is identical with respect to each such organization. 26 C.F.R. § 1.414(c)-2.

It is undisputed that at the time Scott Printing withdrew from the Plan, Daniel Scott and Walter Scott Jr. together owned all the stock of both Scott Printing and Unz, with Daniel Scott owning 75% of each and Walter Jr. owning 25% of each. This means that the two printing companies, Scott and Unz, qualify as businesses under common control, and thus are equally responsible for any withdrawal liability owed by one of the companies. *Corbett v. MacDonald Moving Servs., Inc.,* 124 F.3d 82, 86 (2d Cir.1997).

## D. THE 2005 LETTERS TO SCOTT PRINTING WERE NOT ADEQUATE NOTICE; BUT THE MAY 19, 2008 LETTER TO UNZ WAS NOTICE TO UNZ AND SCOTT PRINTING

■ In order to collect withdrawal liability from an employer, a plan must notify the employer of the amount of liability and the schedule for payment, and demand payment in accordance with the schedule. 29 U.S.C. § 1399. Formal service is not required, *see e.g. Miller v. Collectron Corp.,* 1999 WL 730981, at *6 (E.D.N.Y. Sept. 16, 1999), but the plan must give notice of these three things before it can collect. *Canario v. Lidelco, Inc.,* 782 F.Supp. 749, 753 (E.D.N.Y.1992).

■ "Notice to one member of the control group is considered as notice to all members." *Trustees of Amalgamated Ins. Fund v. Saltz,* 760 F.Supp. 55, 58 (S.D.N.Y.1991); *accord Central States, Southeast and Southwest Areas Pension Fund v. Slotky,* 956 F.2d 1369, 1375 (7th Cir.1992); *McDonald v. Centra, Inc.,* 946 F.2d 1059, 1062 (4th Cir.1991); *Trustees of Amalgamated Ins. Fund v. Sheldon Hall Clothing, Inc.,* 862 F.2d 1020, 1024 (3rd Cir.1988); *Teamsters Pension Trust Fund–Board of Trustees of the Western Conference v. Allyn Transp. Co.,* 832 F.2d 502, 506–7 (9th Cir.1987). This rule comports with the MPPAA's purpose of helping pension funds, by relieving the funds of the burden of discovering and notifying all entities that might potentially be part of a control group with a withdrawing employer, and instead placing the burden on members of control groups (who presumably have knowledge of their own holdings) to inform each other of potential liability. *See IUE AFL–CIO Pension Fund v. Barker & Williamson, Inc.,* 788 F.2d 118, 127–28 (3rd Cir.1986). Therefore, if either of the companies received

statutorily compliant notice, constructive notice is imputed to all other members of the control group. *Id.; Saltz,* 760 F.Supp. at 58.

▮ It is undisputed that the three January 3, 2005 letters and the April 28, 2005 letter were not received by Scott Printing when they were sent. The Plan knew because the letters were "returned to sender". Nonetheless, the Plan contends that these mailings constituted adequate notice under 29 U.S.C. § 1399, stating, "The Plan exercised due diligence in sending them to Scott Printing's last known address." (Memorandum of Law in Support of Plaintiff's Motion for Summary Judgment at 13.)

This assertion is incorrect as a matter of fact. Of the four letters sent in 2005, only one was actually sent to a Scott Printing address. Three of the letters were sent to incorrect addresses.[1] None of the letters appears to have been sent to counsel for Scott Printing, with whom the Plan had communicated in 2003.

The Plan also did not send a letter to Scott Printing's New Jersey address, where the employees involved with the Plan had worked. The Plan states that it did not send notice to the New Jersey address because the facility had been shut for nearly two years. Plaintiff does not explain why it thought the New York City address would still be good if the New Jersey address was not.

Scott Printing is not blameless here. It should have known that the Plan would seek to collect withdrawal liability and provided a forwarding address when it ceased operations. However, its failure to do so does not convert the notice that was sent in 2005 into "adequate notice"—particularly taking into account the length of time between Scott Printing's shutdown and the mailing of the notice, as well as the Plan's failure to try notifying Scott Printing through other channels. The four returned letters sent by the Plan in 2005 do not constitute notice to Scott Printing under 29 U.S.C. § 1399.

The May 19, 2008 letter to Unz, on the other hand, was received by its intended recipient. (Pl. Rule 56.1 Stmt. ¶ 31; Def. Rule 56.1 Reply ¶ 31.) The Plan asserts that this letter constituted actual notice to Unz of Scott Printing's withdrawal liability, and that it met the requirements of 29 U.S.C. § 1399.

Unz argues that the May 19, 2008 letter itself—addressed to Unz—did not contain the amount of withdrawal liability, schedule for payment, and demand for payment. That information was found only in the attached letter of January 3, 2005, which was addressed to Scott Paper. Unz contends that it thus did not interpret the May 19 letter as a notice of withdrawal liability.

Unz's "interpretation" is unreasonable. 29 U.S.C. § 1399 requires only that the plan sponsor "notify" the employer of those three items. The MPPAA does not specify the form that this notification is to take, or mandate a particular template that it must conform to. All that is required is that the plan gives the employer the necessary information. "Due to the remedial purpose of ERISA and the

---

**1.** The correct business address for Scott Printing, as reflected in previous invoices sent to Local 1, was 55 Broadway, New York, New York 10006—also known as 1 Exchange Plaza. (Schlesinger Decl. Ex. P.) Two copies of the January 3 letter, and the April 28 letter were sent to incorrect addresses—two to 55 Broad Street, New York, New York 10006, and one to 1 Exchange Place, New York, New York 10004. A third copy of the January 3 letter was sent to the correct address of 55 Broadway, but it too was returned to sender. Scott Printing states that it vacated the 55 Broadway address sometime in mid–2003. (Scott Aff. ¶ 9.)

MPPAA, the MPPAA's notice provisions are liberally construed to protect pension plan participants." *Bd. of Trs. of Teamsters Local 863 Pension Fund v. Foodtown, Inc.*, 296 F.3d 164, 175 (3rd Cir.2002) (citing *Barker & Williamson*, 788 F.2d at 127). Several courts have held that the filing of a civil complaint can constitute sufficient notice under § 1399. *See e.g. Bowers*, 901 F.2d at 263; *Central States, Southeast and Southwest Areas Pension Fund v. Royal Transport, Ltd.*, 1997 WL 269594, at *2 (N.D.Ill. May 15, 1997); *Tr. of Trucking Employees of North Jersey Welfare Fund, Inc.—Pension Fund v. Canny*, 900 F.Supp. 583, 592 (N.D.N.Y. 1995). Other courts have held that notice "substantially complying" with § 1399 is adequate. *See Central States, Southeast and Southwest Areas Pension Fund v. Basic Am. Inds., Inc.*, 252 F.3d 911, 918 (7th Cir.2001) (bankruptcy proof of claim is sufficient notice); *Chicago Truck Drivers, Helpers and Warehouse Workers Union (Independent) Pension Fund v. Loyal Casket Co.*, 2008 WL 938409, at *3 (N.D.Ill. April 7, 2008) (notice containing an estimate of withdrawal liability is sufficient).

With this purpose of the MPPAA in mind, it is clear that attaching the January 3, 2005 letter to the May 19, 2008 letter sent to Unz qualifies as sufficient notice to both Unz and Scott. The January 3, 2005 letter to Scott that accompanies it clearly lays out the amount of withdrawal liability, a schedule for payment of the liability, and a demand for payment.

Unz argues that the letter does not contain a schedule with which it could comply. The enclosed January 2005 letter sets out a schedule for making payments, but the payment date specified expired long before the letter was received. Therefore, according to Unz, the notice fails to comply with the statute.

But the notice literally complies with the statute—it sets out a schedule (albeit a schedule with which it is impossible to comply)—and so it substantially complies with the statute.

Furthermore, if Unz took issue with the adequacy of the notice it received it was required to demand arbitration. *Bowers*, 901 F.2d at 262 (" 'Any dispute' concerning the notice or amount of withdrawal liability 'shall be resolved through arbitration' " (citing 29 U.S.C. § 1401(c)(1)).) Unz did not do so, and (as is discussed more fully below) it is now too late for Unz to demand arbitration. Defendant has therefore forfeited any argument that the notice did not comply with the statute.

## E. UNZ CANNOT NOW DEMAND ARBITRATION

■ The MPPAA establishes a strict procedure for resolving disputes over withdrawal liability. If there is a dispute, the employer has 90 days from notification to request a review by the plan sponsor. 29 U.S.C. § 1399(b)(2)(A). After this request—whether or not the plan sponsor has responded yet—the employer may initiate arbitration to resolve the dispute. 29 U.S.C. § 1401(a)(1). The deadline for initiating arbitration is either 180 days after the employer's request, or 60 days after the plan sponsor has responded to the request—whichever comes first. Id. If no arbitration is initiated by the earlier of those dates, the amounts demanded by the plan sponsor become due and owing on the schedule provided. 29 U.S.C. § 1401(b)(1). Failure to demand arbitration in a timely manner means the employer forfeits the right to contest the adequacy of notice or the amount owed. 29 U.S.C. § 1401(a)(1), (b)(1); *Levy Bros. Frocks*, 846 F.2d at 885–87.

"Congress intended that disputes over withdrawal liability would be resolved

quickly, and established a procedural bar for employers who fail to arbitrate disputes over withdrawal liability in a timely manner ... The failure to seek such relief on a timely basis may, in some instances, lead to a harsh result, but the harshness of the default is largely a self-inflicted wound." *Levy Bros. Frocks*, 846 F.2d at 887 (internal quotation marks and citations omitted).

In the present case, Unz suffers from just such a self-inflicted wound. Unz received notice of withdrawal liability on or about May 19, 2008. It could have taken one of three routes to arbitration:

(1) request a review of its liability by the Plan and commence arbitration within 60 days of receiving the plan's response,

(2) request a review of its liability by the Plan and commence arbitration within 180 days of making that request for review, or

(3) make a joint request for arbitration with the plan within 180 days after May 19, 2008.

By law, a unilateral request for arbitration had to made by Unz by the earlier of (1) or (2). Any joint request for arbitration—which is the only way arbitration can be commenced if no timely request was made for review of Unz's liability—had to be made no later than November 15, 2008.

To invoke either of the unilateral routes to arbitration, Unz was first required to ask the Plan to review its liability. The statute gives an employer only 90 days to make such a request, so Unz had to request a review by August 17, 2008. It did not do so. By failing to request review on or before August 17, Unz forfeited its right to commence an arbitration unilaterally— and with it, the right to contest the amount owed or the adequacy of the notice. 29 U.S.C. § 1401(a)(1), (b)(1); *Levy Bros. Frocks*, 846 F.2d at 885–87.

Alternatively, Unz and the Plan could have jointly sought arbitration by November 15, 2008. They did not do so (although the Court very much doubts that the Plan would have consented to such a course of action).

Unz argues that the Complaint filed in this case—served on Unz on August 13, 2008—constitutes the statutory notice. Unz further argues that its February 9, 2009 letter to the Plan constitutes a request for review under 29 U.S.C. § 1399(b)(2)(A), and that the Plan's February 18, 2008 letter to Unz constitutes the response to this request under 29 U.S.C. § 1399(b)(2)(B).[2] Since Unz first demanded arbitration on April 20, 2009—within 180 days its February 9 letter, and within 60 days of the Plan's February 19 letter— it argues that the demand for arbitration is timely.

Unz is wrong. The notice required by statute came on or about May 19, 2008. So the 90 days to request review ended

---

**2.** Unz attempts to weave a tangled web of statutes and correspondence to justify its argument that its arbitration request is timely. Unz claims that: (1) its November 10, 2008 discovery demands in this lawsuit constitutes a request for information under 29 U.S.C. § 1401(e) (repealed 2008); (2) the Plan's response to document requests on January 3, 2009 and Response to Interrogatories on February 4, 2009 constitutes a response to Unz's request for information; (3) Unz's February 9, 2009 letter is a request for review pursuant to 29 U.S.C. § 1399(b)(2)(A); (4) the Plan's

February 18, 2009 letter (received by Unz on February 19) is the response to the request for review pursuant to 29 U.S.C. § 1399(b)(2)(B). According to Unz, this exchange resulted in Unz's having 60 days, from February 19, 2009 to demand arbitration. Unz's Cross–Motion for Summary Judgment to compel arbitration was filed on April 20, 2009—exactly 60 days from February 19. Leaving aside Unz's highly questionable interpretation of the statutory requirements, this entire argument is foreclosed by virtue of the Court's finding that the May 19, 2008 letter constituted notice to Unz.

August 17, 2008—well before any of Unz's correspondence to the Plan.

■ Unz argues that its time to seek arbitration should be extended pursuant to the doctrine of equitable tolling. "The MPPAA review and arbitration time limitation … is subject to equitable tolling." *Bowers,* 901 F.2d at 264. Equitable tolling is a doctrine that "calls for the court to extend the statute of limitations beyond the time of expiration," and is designed for "situations in which fraudulent or other conduct concealed the existence of a claim." *Id.* "The party seeking the benefits of equitable tolling must have acted reasonably to discover the facts and to protect its rights." *Id.*

Unz asserts that its time to request arbitration should be extended because the Plan was late in responding to Unz's Request for the Production of Documents and Unz's First Set of Interrogatories, both of which were sent to the Plan on November 10, 2008. Unz contends that it needed the information contained in these requests to decide whether or not to request review of the liability assessment or file for arbitration. However, as explained above, Unz did not serve its discovery requests until long after it was required to request a review by the Plan—which was by August 19, 2008; within 90 days of receiving notice in May 2008.

The Second Circuit addressed a similar situation in *Bowers,* and found that equitable tolling was not warranted when the defendant did nothing to move decisively towards arbitration. *Bowers,* 901 F.2d at 265 ("In the absence of fraud or unfair conduct by the [plaintiff], and in the absence of any affirmative action on the part of [defendant] to preserve its right to arbitration, we find no inequitable circumstances warranting a judicial extension of the time limitation under the doctrine of equitable tolling."). Other courts addressing this issue have ruled similarly. The

Seventh Circuit held in *Banner Indus. v. Central States, Southeast and Southwest Areas Pension Fund* that the district court in that case did not abuse its discretion by tolling the 90–day period for initiating arbitration. 875 F.2d 1285, 1293–94 (7th Cir.1989). The court noted, however, that the plaintiff employer "moved decisively to present the issue in court within the statutory time period for arbitration," and quoted approvingly from the district court's opinion to contrast plaintiff's actions with "a case in which the party assessed did absolutely nothing, waited until the pension filed a collection against it, and then for the first time tried to assert its defenses in court when it should have proceeded in arbitration." *Id.; see also Central States, Southeast and Southwest Areas Pension Fund v. Slotky,* 956 F.2d 1369, 1377 (7th Cir.1992) (defendant employer "neither invoked the statutory procedure for conciliation and arbitration nor sought a judicial declaration that he was not liable … He waited until he was sued—having till then emitted nary a peep to suggest that he was contesting the assessment of withdrawal liability. He thus failed to display due diligence, a precondition of equitable tolling.").

■ The lone case Unz cites in support of its contention is not at odds with these other decisions. The procedural posture of that case was that the pension plan had given the employer notice of withdrawal liability, the employer had requested a massive amount of information to review the determination, and the plan had declined to provide "discovery … prior to or outside arbitration." *John J. Nissen Baking Co., Inc. v. New England Teamsters and Trucking Indus. Pension Fund,* 737 F.Supp. 679, 680 (D.Me.1990). The *employer* then brought a lawsuit, seeking an injunction to compel the plan to produce the requested information, as well as an

extension for the time to request review by the plan and arbitration. *Id.* The court held that the plan was required provide certain information, but that the employer's request was overbroad. The court held that the employer should reformulate its request, and extended the deadlines for seeking review and arbitration. *Id.* As was true in the other cited cases—and unlike the situation before this court—a request for review in that case was made within the statutory deadlines, and the employer in that case took affirmative steps toward seeking arbitration. In this case, Unz's first communication seeking information from the Plan was well after the statutory deadline to seek information, and Unz took no steps toward seeking arbitration until its cross-motion for summary judgment—well after this suit for collection had been filed against it. Unz is not entitled to equitable tolling of its deadline for seeking arbitration.

## F. THE PLAN IS NOT BARRED FROM SEEKING PAYMENT BY THE DOCTRINE OF LACHES

Unz argues that it is entitled to dismissal of this action based on the equitable doctrine of laches. It bases this assertion on the language contained in 29 U.S.C. § 1399(b)(1) that notification to the employer of withdrawal liability be made, "As soon as practicable after an employer's complete or partial withdrawal." Unz argues that if the May 19, 2008 letter is found to constitute notice, then the five years between the date of Scott Printing's withdrawal and the notice is not as soon as practicable, and thus laches should apply.

 "Laches is based on the maxim ... equity aids the vigilant, not those who sleep on their rights. It is an equitable defense that bars a plaintiff's ... claim where he is guilty of unreasonable and inexcusable delay that has resulted in prejudice to the defendant." *Ikelionwu v.*

*U.S.*, 150 F.3d 233, 237 (2d Cir.1998) (internal quotation marks and citations omitted). "[I]n this Circuit, a defendant must establish three elements to prevail on a laches defense: (1) that he lacked knowledge that the claim might be asserted against him; (2) that the plaintiff delayed asserting the claim despite the opportunity to do so; and (3) that he would be prejudiced if the claim were now allowed to go forward." *In re Gucci*, 197 Fed.Appx. 58, 60 (2d Cir.2006) (*citing Rapf v. Suffolk County*, 755 F.2d 282, 292 (2d Cir.1985)).

 As a general matter, laches is not a defense to an action filed within the applicable statute of limitations. *U.S. v. Mack*, 295 U.S. 480, 489, 55 S.Ct. 813, 79 L.Ed. 1559 (1935); *see also U.S. v. Milstein*, 401 F.3d 53, 63 (2d Cir.2005); *Ivani Contracting Corp. v. City of New York*, 103 F.3d 257, 260 (2d Cir.1997) ("The prevailing rule, then, is that when a plaintiff brings a federal statutory claim seeking legal relief, laches cannot bar that claim, at least where the statute contains an express limitations period within which the action is timely.").

 However, the United States Supreme Court has indicated that a defense of laches may apply to a claim that a plan did not notify an employer "as soon as practicable" after withdrawal, even if still within the statute of limitations. *See e.g. Bay Area Laundry and Dry Cleaning Pension Trust Fund v. Ferbar Corp. of California, Inc.*, 522 U.S. 192, 205, 118 S.Ct. 542, 139 L.Ed.2d 553 (1997) ("[I]f an employer believes the trustees have failed to comply with their 'as soon as practicable' responsibility, the employer may assert that violation as a laches objection at an arbitration contesting the withdrawal liability assessment."); *see also Brentwood Fin. Corp. v. Western Conference of Teamsters Pension Trust Fund*, 902 F.2d 1456, 1459–60 (9th Cir.1990); *In re Centric*

*Corp.,* 901 F.2d 1514, 1519 (10th Cir.1990) ("The defense of laches is available in a suit to collect a claim for withdrawal liability."); *Levy Bros. Frocks,* 846 F.2d at 887; *Canny,* 900 F.Supp. at 594 ("The Court realizes that defendants arguably could raise a claim of laches based on 29 U.S.C. § 1399(b)(1)"). These cases indicate that, while there is no hard and fast rule for what constitutes "as soon as practicable," laches is available as a defense if the plan has unreasonably delayed in notifying the employer. *Levy Bros. Frocks,* 846 F.2d at 887.

■■■■ However, if laches is claimed as a defense to a claim for withdrawal liability, the issue must be arbitrated. *Bay Area Laundry,* 522 U.S. at 192, 118 S.Ct. 542; *Giroux Bros. Transp., Inc. v. New England Teamsters & Trucking Indus. Pension Fund,* 73 F.3d 1, 4 (1st Cir. 1996); *Vaughn v. Sexton,* 975 F.2d 498, 502 (8th Cir.1992); *ILGWU Nat'l Ret. Fund v. Smart Modes of Cal., Inc.,* 735 F.Supp. 103, 107 (S.D.N.Y.1990). As discussed above, Unz has waived its right to present any defenses that it could have presented had it sought arbitration by failing to comply with the statutory prerequisites for demanding arbitration.

## G. THERE ARE NO DISPUTED ISSUES OF MATERIAL FACT

■■■ As a final attempt to ward off summary judgment, Unz argues that there exist issues of fact that must be resolved through either arbitration or trial—namely, the discrepancies between November 29, 2004 letter and the other letters and complaint. The November 29, 2004 letter—which was never received by Scott Printing or Unz—stated that Scott Printing completely withdrew from the Plan on January 17, 2003, and assessed withdrawal liability at $47,160, which would be payable in 18 quarterly payments of $3,372.75, plus a final payment of $3,351.21. (Schlesinger

Decl. Ex. D.) The Complaint, as well as the January 3, 2005 letters—including the copy attached to the May 19, 2008 letter that constituted notice—state that Scott Printing completely withdraw from the Plan on January 24, 2003, that the total amount of withdrawal liability is $765,474, and that it is payable in 33 quarterly payments of $30,099.25 each, with a final payment of $3,671.75. (Schlesinger Decl. Ex. A, E–G.)

These discrepancies relate to the amount of assessed withdrawal liability, the form of the assessment, and the schedule for payment. Such disputed facts (and it is not clear that they are *genuinely* disputed) cannot possibly be material *to this court.* The MPPAA and the cases are clear—if an employer wishes to dispute anything relating to its assessed liability or payment schedule, it must raise the matter in a timely arbitration. 29 U.S.C. § 1401(a)(1); *Bowers,* 901 F.2d at 262. As discussed above, Unz has forfeited its right to arbitration, and thus cannot contest those issues in this court. Unz is therefore obligated to pay the amount of liability assessed in the notice of withdrawal liability—in this case, the $765,474 contained in the letter attached to the May 19, 2008 letter.

## H. UNZ WAS IN DEFAULT WHEN IT RECEIVED THE COMPLAINT IN THIS ACTION

■■■ An employer's "default" for purposes under the MPPAA is defined as "the failure of an employer to make, when due, any payment under this section, if the failure is not cured within 60 days after the employer receives written notification from the plan sponsor of such failure." 29 U.S.C. § 1399(c)(5). If a default has occurred, the plan sponsor is entitled to demand immediate payment of the remaining unpaid amount of withdrawal liability, plus

interest on the total amount outstanding from the due date of the first missed payment. Id.

In this case, Unz received notice of its liability on or about May 19, 2008. Under 29 U.S.C. § 1399(c)(2), it was required to make its first payment within 60 days, no later than July 18, 2008. Unz did not make this payment. Unz did not make payments within 60 days of receiving the complaint; therefore Unz is in default, and the Plan is entitled to demand payment of the full amount of withdrawal liability.

On August 13, 2008, Unz was served with the Complaint in this action. The complaint served as "written notification" to Unz of its failure to begin making payments within 60 days of the notice. *See e.g. Trs. of the Local 531 Pension Plan v. Corner Distribs., Inc.,* 2008 WL 2687085, at *4 (E.D.N.Y. July 8, 2008); *Canny,* 900 F.Supp. at 593 n. 3; *Debreceni v. Merchs. Terminal Corp.,* 740 F.Supp. 894, 900 (D.Mass.1989).

## I. DAMAGES

 Unz is liable for the full amount of the withdrawal liability demanded by Plaintiff—$765,474.

29 U.S.C. § 1132(g)(2) provides that, in an action for delinquent contributions, the court shall award to a prevailing plan interest on the unpaid contributions, reasonable attorney's fees and costs of the action, and liquidated damages as provided under the plan, up to 20% of the amount of liability. § 1132(g)(2) is made applicable to actions for unpaid withdrawal liability through 29 U.S.C. § 1451(b).

The Plan provides for liquidated damages of 20% of the delinquency, which amounts to $153,094.80. (Savlick Decl. Ex. B at 29.) Under 29 U.S.C. § 1399(c)(5), interest accrues from the due date of the first missed payment. Unz received notice of its withdrawal liability on or about May 19, 2008; it was therefore obligated to

make its first payment by July 18, 2008. The Plaintiff shall provide the Court with an interest calculation (including an amount due through the date of submission and an amount to be added each day thereafter until judgment is finally entered) and an affidavit of attorney's fees, by November 13, 2009.

### Conclusion

This constitutes the decision and order of the Court.